# BURGER *v.* KEMP, WARDEN

No. 86–5375.  Argued March 30, 1987—Decided June 26, 1987

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, and in Part II of which POWELL, J., joined, *post*, p. 796. POWELL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 817.

*Joseph M. Nursey* argued the cause for petitioner. With him on the briefs was *Millard C. Farmer*.

*William B. Hill, Jr.*, Senior Assistant Attorney General of Georgia, argued the cause for respondent. With him on the brief were *Michael J. Bowers*, Attorney General, *Marion O. Gordon*, First Assistant Attorney General, and *Susan V. Boleyn*, Senior Assistant Attorney General.

JUSTICE STEVENS delivered the opinion of the Court.

A jury in the Superior Court of Wayne County, Georgia, found petitioner Christopher Burger guilty of murder and sentenced him to death on January 25, 1978. In this habeas corpus proceeding, he contends that he was denied his constitutional right to the effective assistance of counsel because his lawyer labored under a conflict of interest and failed to make an adequate investigation of the possibly mitigating cir-

cumstances of his offense. After a full evidentiary hearing, the District Court rejected the claim. We are persuaded, as was the Court of Appeals, that the judgment of the District Court must be affirmed.

I

The sordid story of the crime involves four soldiers in the United States Army who were stationed at Fort Stewart, Georgia, on September 4, 1977. On that evening, petitioner and his coindictee, Thomas Stevens, both privates, were drinking at a club on the post. They talked on the telephone with Private James Botsford, who had just arrived at the Savannah Airport, and agreed to pick him up and bring him back to the base. They stole a butcher knife and a sharpening tool from the mess hall and called a cab that was being driven by Roger Honeycutt, a soldier who worked part-time for a taxi company. On the way to the airport, petitioner held the knife and Stevens held the sharpening tool against Honeycutt. They forced him to stop the automobile, robbed him of $16, and placed him in the backseat. Petitioner took over the driving. Stevens then ordered Honeycutt to undress, threw each article of his clothing out of the car window after searching it, blindfolded him, and tied his hands behind his back. As petitioner drove, Stevens climbed into the backseat with Honeycutt, where he compelled Honeycutt to commit oral sodomy on him and anally sodomized him. After stopping the car a second time, petitioner and Stevens placed their victim, nude, blindfolded, and hands tied behind his back, in the trunk of the cab. They then proceeded to pick up Botsford at the airport. During the ride back to Fort Stewart, they told Botsford that they had stolen the cab and confirmed their story by conversing with Honeycutt in the trunk. In exchange for Botsford's promise not to notify the authorities, they promised that they would not harm Honeycutt after leaving Botsford at the base.

Ultimately, however, petitioner and Stevens drove to a pond in Wayne County where they had gone swimming in the past. They removed the cab's citizen-band radio and, while

Stevens was hiding the radio in the bushes, petitioner opened the trunk and asked Honeycutt if he was all right. He answered affirmatively. Petitioner then closed the trunk, started the automobile, and put it in gear, getting out before it entered the water. Honeycutt drowned.

A week later Botsford contacted the authorities, and the military police arrested petitioner and Stevens. The two men made complete confessions. Petitioner also took the military police to the pond and identified the point where Honeycutt's body could be found. Petitioner's confession and Private Botsford's testimony were the primary evidence used at Burger's trial. That evidence was consistent with the defense thesis that Stevens, rather than petitioner, was primarily responsible for the plan to kidnap the cabdriver, the physical abuse of the victim, and the decision to kill him. Stevens was 20 years old at the time of the killing. Petitioner was 17;[1] a psychologist testified that he had an IQ of 82 and functioned at the level of a 12-year-old child.

## II

Alvin Leaphart was appointed to represent petitioner about a week after his arrest. Leaphart had been practicing law in Wayne County for about 14 years, had served as the

---

[1] In his direct review and collateral proceedings to date, petitioner has not advanced the claim that execution by a State of a person for a murder committed while a minor violates the Eighth and Fourteenth Amendments to the Constitution. Cf. *Thompson* v. *State*, 724 P. 2d 780 (Okla. Crim. App. 1986) (defendant was 15 years old at time of crime), cert. granted, 479 U. S. 1084 (1987). We have held that a habeas petitioner may "establish cause for a procedural default if his claim is 'so novel that its legal basis is not reasonably available to counsel.'" *Murray* v. *Carrier*, 477 U. S. 478, 489–490 (1986) (quoting *Reed* v. *Ross*, 468 U. S. 1, 16 (1984)). Of course, we do not now determine whether the legal basis for a constitutional claim based on the youth of the defendant was reasonably available to petitioner in 1978. Nor do we rule upon whether refusal to consider such a claim would carry with it "the risk of a manifest miscarriage of justice" and would thus permit a habeas corpus court to address the merits of the claim in a subsequent proceeding. *Smith* v. *Murray*, 477 U. S. 527, 537–538 (1986).

county's attorney for most of that time, and had served on the Board of Governors of the State Bar Association. About 15 percent of his practice was in criminal law, and he had tried about a dozen capital cases. It is apparent that he was a well-respected lawyer, thoroughly familiar with practice and sentencing juries in the local community. He represented petitioner during the proceedings that resulted in his conviction and sentence, during an appeal to the Georgia Supreme Court which resulted in a vacation of the death penalty, during a second sentencing hearing, and also during a second appeal which resulted in affirmance of petitioner's capital sentence in 1980. *Burger* v. *State*, 242 Ga. 28, 247 S. E. 2d 834 (1978); *Burger* v. *State*, 245 Ga. 458, 265 S. E. 2d 796, cert. denied, 446 U. S. 988 (1980). Leaphart was paid approximately $9,000 for his services.

After exhausting his state collateral remedies, petitioner (then represented by a different attorney) filed a habeas corpus proceeding in the United States District Court for the Southern District of Georgia. He advanced several claims, including a charge that Leaphart's representation had been constitutionally inadequate. The District Court conducted an evidentiary hearing and emphatically rejected that claim,[2] but concluded that the trial court's instructions to the jury

---

[2] "The Court most definitely finds no basis for concluding that Mr. Leaphart's representation was constitutionally inadequate." *Blake* v. *Zant*, 513 F. Supp. 772, 802 (1981). In a footnote, the court added:

"This Court is particularly concerned by arguments raised with respect to ineffective assistance of counsel. I certainly do not question the wisdom or the propriety of advancing every legitimate argument on petitioner's behalf. However, many, if not all, the allegations made against Mr. Leaphart are directly contradicted by the record. Thus, they could not possibly be of any benefit to Mr. Burger. On the other hand, the raising of such unfounded charges must have a significant 'chilling effect' on the willingness of experienced attorneys, like Mr. Leaphart, to undertake the defense of capital cases. Petitioner's attorneys here might do well to reconsider their apparent policy of routinely attacking the performance of trial counsel in light of this fact." *Id.*, at 802, n. 13.

permitted it to base its sentencing decision on an invalid aggravating circumstance. Accordingly, the District Court vacated petitioner's death sentence. *Blake* v. *Zant*, 513 F. Supp. 772 (1981).

The Court of Appeals affirmed in part, reversed in part, and reinstated the death penalty. *Burger* v. *Zant*, 718 F. 2d 979 (CA11 1983). On the issue of Leaphart's competence, it adopted the District Court's opinion as its own over the dissent of Judge Johnson. The dissent found that Leaphart had a conflict of interest because his partner Robert Smith[3] had been appointed to represent Stevens in his later, separate trial for the murder of Honeycutt, and Leaphart had assisted in that representation. He had interviewed Stevens and assisted his partner during Stevens' trial. Moreover, the two partners shared their legal research and discussed the cases with one another. Judge Johnson was persuaded that the conflict created actual prejudice to petitioner's interest for two reasons. First, each of the two defendants sought to emphasize the culpability of the other in order to avoid the death penalty. Second, Leaphart failed to negotiate a plea bargain in which petitioner's testimony against Stevens might be traded for a life sentence. Judge Johnson was also persuaded that Leaphart's performance was defective because he did not conduct an adequate investigation of possible mitigating circumstances and did not have a valid strategic explanation for his failure to offer any mitigating evidence at either the first or the second sentencing hearing.

After the Court of Appeals rendered its decision, we decided *Strickland* v. *Washington*, 466 U. S. 668 (1984). We granted Burger's petition for certiorari and remanded the case to the Court of Appeals for consideration of "the effectiveness of counsel's assistance at petitioner's second sentencing hearing" in light of that decision. *Burger* v. *Zant*,

---

[3] Leaphart and Smith were both members of the same professional corporation. The form of their business organization is not relevant to this case and they will be described as partners for the sake of convenience.

467 U. S. 1212, 1213 (1984). The Court of Appeals in turn remanded the case to the District Court with instructions to extend or revise its findings, and if appropriate, its conclusions on the ineffective-assistance-of-counsel claim. *Burger* v. *Zant*, 741 F. 2d 1274 (CA11 1984). The District Court wrote a more extensive opinion on that issue and again concluded that there was no merit to petitioner's claim. Once again, the Court of Appeals affirmed on the basis of the District Court's opinion, over the dissent of Judge Johnson. *Burger* v. *Kemp*, 753 F. 2d 930 (CA11 1985) *(per curiam)*.[4] We granted the petition for certiorari, vacated, and remanded for reconsideration in light of *Francis* v. *Franklin*, 471 U. S. 307 (1985), on the question whether the jury instruction impermissibly shifted the burden of proof on the issue of intent. *Burger* v. *Kemp*, 474 U. S. 806 (1985). The Court of Appeals assumed the trial court's charge on intent unconstitutionally shifted the burden of proof, but found the error harmless beyond a reasonable doubt. 785 F. 2d 890 (1986) *(per curiam)*. We granted certiorari, 479 U. S. 929 (1986), and now affirm. We first consider counsel's alleged conflict of interest argument and then his failure to offer mitigating evidence.[5]

---

[4] The opinion of the District Court is published as an Appendix to the Court of Appeals' opinion. 753 F. 2d, at 932–942.

[5] Petitioner also argues in this proceeding that the malice charge given to the jury at the guilt or innocence phase of his trial was unconstitutional under *Francis* v. *Franklin*, 471 U. S. 307 (1985). The trial court charged the jury that a "person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts." The Court of Appeals observed that the jury instruction was "virtually identical to the one held unconstitutional in *Franklin*," 785 F. 2d, at 891, even though the trial court also instructed the jury that a person will not be presumed to act with criminal intent and that a specific intent to commit the crime charged was an essential element of the crime that the State must prove beyond a reasonable doubt. The Court of Appeals found any error harmless beyond a reasonable doubt. We agree with the Court of Appeals that, pretermitting the inquiry whether the trial judge's charge to the jury impermissibly shifted the burden of proof on the question of petitioner's criminal intent

## III

There is certainly much substance to petitioner's argument that the appointment of two partners to represent coindictees in their respective trials creates a possible conflict of interest that could prejudice either or both clients. Moreover, the risk of prejudice is increased when the two lawyers cooperate with one another in the planning and conduct of trial strategy, as Leaphart and his partner did. Assuming without deciding that two law partners are considered as one attorney, it is settled that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway* v. *Arkansas*, 435 U. S. 475, 482 (1978). We have never held that the possibility of prejudice that "inheres in almost every instance of multiple representation" justifies the adoption of an inflexible rule that would presume prejudice in all such cases. See *Cuyler* v. *Sullivan*, 446 U. S. 335, 348 (1980). Instead, we presume prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U. S., at 692 (citation omitted). See also *Cuyler*, 446 U. S., at 348, 350.

As an initial matter, we agree with the District Court that the overlap of counsel, if any, did not so infect Leaphart's representation as to constitute an active representation of competing interests. Particularly in smaller communities where the supply of qualified lawyers willing to accept the demanding and unrewarding work of representing capital prisoners is extremely limited, the defendants may actually benefit from the joint efforts of two partners who supplement

---

to commit murder, "'the evidence was so dispositive of intent'" that it can be said beyond a reasonable doubt that "'the jury would have found it unnecessary to rely on the presumption.'" See *Rose* v. *Clark*, 478 U. S. 570, 583 (1986) (quoting *Connecticut* v. *Johnson*, 460 U. S. 73, 97, n. 5 (1983) (POWELL, J., dissenting)).

one another in their preparation. In many cases a "'common defense . . . gives strength against a common attack.'" *Holloway* v. *Arkansas*, 435 U. S., at 482–483 (quoting *Glasser* v. *United States*, 315 U. S. 60, 92 (1942) (dissenting opinion of Frankfurter, J.)). Moreover, we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client. Trial courts appropriately and "necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Cuyler*, 446 U. S., at 347. In addition, petitioner and Stevens were tried in separate proceedings; as we noted in *Cuyler*, the provision of separate murder trials for the three coindictees "significantly reduced the potential for a divergence in their interests." *Ibid.*

In an effort to identify an actual conflict of interest, petitioner points out that Leaphart prepared the briefs for both him and Stevens on their second appeal to the Georgia Supreme Court, and that Leaphart did not make a "lesser culpability" argument in his appellate brief on behalf of petitioner even though he had relied on petitioner's lesser culpability as a trial defense. Given the fact that it was petitioner who actually killed Honeycutt immediately after opening the trunk to ask if he was all right, and the further fact that the Georgia Supreme Court expressed the opinion that petitioner's actions were "outrageously and wantonly vile and inhuman under any reasonable standard of human conduct," *Burger* v. *State*, 245 Ga., at 461–462, 265 S. E. 2d, at 800, the decision to forgo this issue had a sound strategic basis. As we reaffirmed in *Smith* v. *Murray*, 477 U. S. 527, 536 (1986), the "process of 'winnowing out weaker claims on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy. *Jones* v. *Barnes*, 463 U. S. 745, 751–752 (1983)."

In addition, determining that there was an actual conflict of interest requires the attribution of Leaphart's motivation for not making the "lesser culpability" argument to the fact

that his partner was Stevens' lawyer, or to the further fact that he assisted his partner in that representation. The District Court obviously credited his testimony to the contrary, see 513 F. Supp., at 795; 753 F. 2d, at 941, and its findings were twice sustained by the Court of Appeals. It would thus be most inappropriate, and factually unsupportable, for this Court to speculate·that the drafting of a brief on appeal was tainted by a lawyer's improper motivation. Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case. Nevertheless, when the lower courts have found that a lawyer has performed his or her solemn duties in such a case at or above the lower boundary of professional competence, both respect for the bar and deference to the shared conclusion of two reviewing courts prevent us from substituting speculation for their considered opinions. The district judge, who presumably is familiar with the legal talents and character of the lawyers who practice at the local bar and who saw and heard the witness testify, is in a far better position than we are to evaluate a charge of this kind, and the regional courts of appeals are in a far better position than we are to conduct appellate review of these heavily fact-based rulings.

We also conclude that the asserted actual conflict of interest, even if it had been established, did not harm his lawyer's advocacy. Petitioner argues that the joint representation adversely affected the quality of the counsel he received in two ways: Leaphart did not negotiate a plea agreement resulting in a life sentence, and he failed to take·advantage of petitioner's lesser culpability when compared with his co-indictee Stevens. We find that neither argument provides a basis for relief.

The notion that the prosecutor would have been receptive to a plea bargain is completely unsupported in the record. The evidence of both defendants' guilt, including their confessions, and eyewitness and tangible evidence, was overwhelming and uncontradicted; the prosecutor had no need

for petitioner's eyewitness testimony to persuade the jury to convict Stevens and to sentence him to death. In these circumstances, there is not the slightest reason for appellate doubt of the veracity of Leaphart's testimony:

"Q. Did you ever engage in any plea negotiations in this case?

"A. Yes.

"Q. Could you tell me the substance of it?

"A. Well, we—I constantly all during the time I represented Mr. Burger tried to negotiate a plea with the district attorney for a life sentence. And, he—during the first trial he just flatly refused to even discuss it in any terms. And, then when we got it reversed on the sentence feature I continued to—in that time to try to negotiate with the—with the district attorney about entering a plea, for Mr. Burger to serve a life sentence. And, he insisted on trying it and insisted on seeking the death penalty." App. 74–75.

As the District Court found, Leaphart "constantly attempted to plea bargain with the prosecutor," but was rebuffed. 753 F. 2d, at 940. "The prosecutor's flat refusal to engage in plea bargaining is not surprising when viewed in light of the strength of the case against Burger." *Ibid.*

The argument that his partner's representation of Stevens inhibited Leaphart from arguing petitioner's lesser culpability because such reliance would be prejudicial to Stevens is also unsupported by the record. Such an argument might have been more persuasive if the two defendants had been tried together. As the State conducted the prosecutions, however, each defendant's confession was used in his trial but neither was used against the coindictee. Because the trials were separate, Leaphart would have had no particular reason for concern about the possible impact of the tactics in petitioner's trial on the outcome of Stevens' trial. More-

over, in the initial habeas corpus proceeding, the District Court credited Leaphart's uncontradicted testimony that "he in no way tailored his strategy toward protecting Stevens." 513 F. Supp., at 795. The District Court concluded that his "testimony is strongly supported by examination of trial record, which shows considerable effort to gain mercy for petitioner by portraying Stevens as the chief architect of the crime." *Ibid.*[6]

In an effort to bolster his claim that an adverse effect resulted from Leaphart's actual conflict of interest, petitioner

---

[6] We note that Leaphart persisted in this strategy in his closing argument to the jury at the second sentencing hearing. He argued, in part:

"Each and every one of these acts, according to this statement which they have introduced into evidence, the initiation of the crime, the act of robbery, the acts of sodomy, the acts of tying him up, the telling him to get in the trunk, the saying let's kill him, telling him where to drive, telling him we must get rid of the car, we must get rid of the fingerprints, who was that? That was all Stevens. Stevens is not on trial here today.

"Now, this boy here was seventeen years old at that time, and Stevens was twenty. Now, we all know that the influence that a twenty year old person has over a seventeen year old person who he looks on as his friend and companion. And, all of this bears out that Stevens was the one in control. . . .

". . . You may recommend life imprisonment even though you have found aggravating circumstances, or one or more of the aggravating circumstances given to you in this charge to have existed beyond a reasonable doubt.

"Well, why is that the law? That's the law because of the situations such as this where you have a moving force, and you have a person who follows along and does the beating [bidding] of an individual, who gets convicted of murder. And, the person who actually perpetrated the crime was, and actually was the catalyst, the moving force that carried it all about and did all these things even though this person was a part of it, that the punishment of one is different from the punishment of the other, or can be. That was in your discretion.

"And, in this particular situation, even though you say under these set of circumstances these things existed, Burger did none of that, except being involved there at that time and going along with Stevens who was the leader." 2 Tr. 252–254 (second sentencing hearing).

argues that because he was tried in a small community in which the facts of the crime were widely known, "it necessarily follows that the public, and very possibly members of the jury, knew that the cases were being tried on inherently inconsistent theories." Brief for Petitioner 14. But this observation does nothing to establish an actual, deleterious conflict of interest between Leaphart's work for his client and his partner's representation of Stevens. If two unaffiliated lawyers, complete strangers to one another, had represented Burger and Stevens respectively and had advanced the same defenses that were advanced, the community would have had the same awareness that the theories were inherently inconsistent. There was undoubtedly a conflict of interest between Burger and Stevens because of the nature of their defenses. But this inherent conflict between two participants in a single criminal undertaking cannot be transformed into a Sixth Amendment violation simply because the community might be aware that their respective attorneys were law partners.

## IV

The District Court expressed much more concern about petitioner's argument that Leaphart had failed to develop and present mitigating evidence at either of the two sentencing hearings. See 513 F. Supp., at 796. At both hearings Leaphart offered no mitigating evidence at all. A capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable—it is "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland,* 466 U. S., at 686, 687. We therefore must determine whether Leaphart's performance in evaluating the mitigating evidence available to him, and in deciding not to pursue further mitigating evidence, undermines confidence in the adversarial process of this case. In embarking

on our review of the District Court's conclusions, we are guided by our most recent admonition on this subject:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle* v. *Isaac*, 456 U. S. 107, 133–134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland* v. *Washington*, 466 U. S., at 689.

The evidence that might have been presented would have disclosed that petitioner had an exceptionally unhappy and unstable childhood.[7] Most of this evidence was described by petitioner's mother, who testified at length at the habeas

---

[7] We have no doubt that this potential testimony would have been relevant mitigating evidence that the sentencer could not have refused to consider and could not have been precluded from considering had counsel sought to introduce it. See *Hitchcock* v. *Dugger*, 481 U. S. 393, 398–399 (1987); *Skipper* v. *South Carolina*, 476 U. S. 1, 4–5 (1986); *Eddings* v. *Oklahoma*, 455 U. S. 104, 114–116 (1982); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion). In light of petitioner's youth at the time of the offense, evidence of his "neglectful, sometimes even violent, family background" and testimony that his "mental and emotional development were at a level several years below his chronological age" could not have been excluded by the state court. *Eddings*, 455 U. S., at 116. It is equally clear, however, that the undisputed relevancy of this information and the trial court's corresponding duty to allow its consideration have no bearing on the quite distinct question before us. That issue is whether counsel acted reasonably in deciding not to introduce the evidence out of apprehension that it would contribute little to his client's chances of obtaining a life sentence while revealing possibly damaging details about his past and allowing foreseeably devastating cross-examination.

corpus hearing. At the age of 14 she married Burger's father, who was 16. She was divorced from petitioner's father when petitioner was nine years old. She remarried twice, and neither of petitioner's stepfathers wanted petitioner in the home; one of them beat his mother in petitioner's presence when he was 11 and the other apparently "got him involved with marijuana, and that was the whole point of his life, where the next bag was coming from, or the next bottle of beer. And, this was the kind of influence that he had." App. 91. When his mother moved from Indiana to Florida, petitioner ran away from his father and hitchhiked to Tampa. After he became involved in an auto accident, she returned him to Indiana where he was placed in a juvenile detention home until he was released to his father's custody. Except for one incident of shoplifting, being absent from school without permission, and being held in juvenile detention—none of which was brought to the jury's attention—petitioner apparently had no criminal record before entering the Army.

Leaphart was aware of some, but not all, of this family history prior to petitioner's trial. He talked with petitioner's mother on several occasions,[8] an attorney in Indiana who

---

[8] There was a conflict in the testimony with respect to the extent of these conversations which the District Court described in its first treatment of the issue as follows:

"Mrs. Foster testified that Mr. Leaphart made only very minimal efforts to discuss petitioner's case with her and to develop possible mitigating factors. Mr. Leaphart's account suggested that he had talked with Mrs. Foster several times and made adequate if hardly ideal inquiries. Mr. Leaphart's account is supported by his bill, which lists two conferences totaling three and a half hours prior to trial and four conferences of unstated duration prior to retrial. Defendant's Exhibits 1, 2. Thus, the Court must conclude that Mr. Leaphart's investigation appears to meet at least minimal professional standards." 513 F. Supp., at 796, n. 6.

On remand from the Court of Appeals, the District Court concluded:

"Interviews with Burger, Burger's mother, and an attorney who had befriended Burger and his mother, in addition to his consultation with a psychologist, and review of psychologists' reports obtained through Burger's mother convinced Leaphart that a more exhaustive investigation into

had befriended petitioner and his mother, and a psychologist whom Leaphart had employed to conduct an examination of petitioner in preparation for trial.   He reviewed psychologists' reports that were obtained with the help of petitioner's mother.   *Id.*, at 50–51.   He also interviewed Stevens and other men at Fort Stewart.   *Id.*, at 51.   Based on these interviews, Leaphart made the reasonable decision that his client's interest would not be served by presenting this type of evidence.

His own meetings with petitioner, as well as the testimony of the psychologist at the hearing on the admissibility of petitioner's confession, convinced Leaphart that it would be unwise to put petitioner himself on the witness stand.   The record indicates that petitioner never expressed any remorse about his crime, and the psychologist's testimony indicates that he might even have bragged about it on the witness stand.[9]   Leaphart formed the opinion that Burger enjoyed

Burger's background would not be a profitable pursuit.   He also concluded that presenting background and character evidence to the sentencing jury would have been at best unproductive, and at worst, harmful to his client." *Burger* v. *Kemp*, 753 F. 2d 930, 935 (CA11 1985) (footnotes omitted; citations to transcript of second sentencing hearing omitted).

[9] "Q. Do you have an opinion, based on your examination of Mr. Burger, both your use of Wechsler IQ test and your other examination, and based on your experience as a psychologist, do you have an opinion as to whether or not he could appreciate the consequences of the making of a confession?

"A. I would think he would enjoy the idea, frankly.   This would be a great opportunity to display his psychopathological behavior.   He'd probably shout in the wind as much as he could of all the things he might have done.

"Q. But could he appreciate the trouble or the consequences of, or the magnitude of what he was doing?

"A. His grade of deficiency with a relative IQ of 82 would not [be] beyond the concept of understanding right from wrong.   His psychopathology would make him want to do wrong, basically within his structure. He's just as determined to do evil as a preacher is determined to do [good], if I could use that as an illustration.   So in the concept of appreciating any

talking about the crimes; he was worried that the jury might regard Burger's attitude on the witness stand as indifferent or worse. *Id.*, at 75–76. Quite obviously, as the District Court concluded, an experienced trial lawyer could properly have decided not to put either petitioner or the psychologist who had thus evaluated him in a position where he would be subjected to cross-examination that might be literally fatal. 753 F. 2d, at 935–936.

The other two witnesses that Leaphart considered using were petitioner's mother and the Indiana lawyer who had acted as petitioner's "big brother." Leaphart talked with the mother on several occasions and concluded that her testimony would not be helpful and might have been counterproductive. As the record stood, there was absolutely no evidence that petitioner had any prior criminal record of any kind. Her testimony indicates that petitioner had committed at least one petty offense. App. 90. The District Judge who heard all of the testimony that she would have given on direct examination at the sentencing hearing was not convinced that it would have aided petitioner's case; it was surely not unreasonable for Leaphart to have concluded that cross-examination might well have revealed matters of historical fact that would have harmed his client's chances for a life sentence.

The Indiana lawyer was willing to travel to Georgia to testify on petitioner's behalf, but nothing in the record describes the content of the testimony he might have given. Although Leaphart was unable to recall the details of the background information that he received from the Indiana lawyer, he testified that the information was not helpful to petitioner, *id.*, at 57, and the Indiana lawyer apparently

confession he would make, it would be to him almost a compelling need, because any psychopath has no pleasure, has no joy unless he can at some point along the line let the world know of his behavior, which to most of us is very unseemingly." 1 Tr. 249–251 (first sentencing hearing).

agreed with that assessment. *Id.*, at 57–58. Consistently with that conclusion, petitioner's present counsel—even with the benefit of hindsight—has submitted no affidavit from that lawyer establishing that he would have offered substantial mitigating evidence if he had testified. Accordingly, while Leaphart's judgment may have been erroneous, the record surely does not permit us to reach that conclusion.

Finally, petitioner submitted several affidavits to the court to describe the evidence that Leaphart might have used if he had conducted a more thorough investigation. These affidavits present information about petitioner's troubled family background that could have affected the jury adversely by introducing facts not disclosed by his clean adult criminal record. The affidavits indicate that the affiants, had they testified, might well have referred on direct examination or cross-examination to his encounters with law enforcement authorities. For example, a former neighbor, Phyllis Russell, stated that petitioner's father did not want to associate with him when he "got into trouble and was on juvenile probation." 1 Record 142. Petitioner's uncle, Earnest Holtsclaw, narrated that petitioner "got involved with drugs" while in Florida. *Id.*, at 145. Cathy Russell Ray, petitioner's friend in junior high school, stated that "Chris's father was supposed to go with him to juvenile court to get a release so that he could join the service [Army]." *Id.*, at 149.

Even apart from their references to damaging facts, the papers are by no means uniformly helpful to petitioner because they suggest violent tendencies that are at odds with the defense's strategy of portraying petitioner's actions on the night of the murder as the result of Stevens' strong influence upon his will. For example, the District Judge pointed out:

> "In an affidavit submitted to this Court, petitioner's uncle attests that petitioner came from a broken home and that he was unwanted by his parents. He opined

that Burger had a split personality. 'Sometimes [Burger] would be a nice, normal guy, then at times he would flip out and would get violent over nothing.' Affidavit of Earnest R. Holtcsclaw *[sic]* at 1–2; *see also* Affidavit of Cathy Russell Ray at 1 ('He had a hairtrigger temper. He would get mad and punch the walls. Once he broke his knuckles he got so ma[d].'). On one hand, a jury could react with sympathy over the tragic childhood Burger endured. On the other hand, since Burger's sanity was not in issue in this case, the prosecution could use this same testimony, after pointing out that petitioner was nevertheless responsible for his acts, to emphasize that it was this same unpredictable propensity for violence which played a prominent role in the death of Burger's victim. *See* note 6, *supra.* '[M]itigation . . . ,' after all, [m]ay be in the eye of the beholder.' *Stanley* v. *Zant,* 697 F. 2d 955, 969 & n. 11 (11th Cir. 1983) (footnote omitted)." 753 F. 2d, at 937–938, n. 7.

The record at the habeas corpus hearing does suggest that Leaphart could well have made a more thorough investigation than he did. Nevertheless, in considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States* v. *Cronic,* 466 U. S. 648, 665, n. 38 (1984). We have decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U. S., at 690–691. Applying this standard, we agree with the courts below that counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment. It appears that he did interview all potential witnesses who had been called to his attention and

that there was a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about Burger's past. We hold that the Court of Appeals complied with the directives of *Strickland:*

> "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.,* at 691.

## V

Petitioner has not established that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.,* at 690. He "has made no showing that the justice of his sentence was rendered unreliable by a breakdown

in the adversary process caused by deficiencies in counsel's assistance." *Id.*, at 700.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, and, as to Part II, JUSTICE POWELL joins, dissenting.

In *Strickland* v. *Washington,* 466 U. S. 668 (1984), this Court set forth the standards that are to govern a court's consideration of a criminal defendant's claims that he has been denied his Sixth Amendment right to effective assistance of counsel. Petitioner Burger presents two such claims in this case. I believe each claim meets those specified standards for establishing a constitutional violation. Each therefore calls for a grant of the federal habeas corpus relief sought by petitioner. Accordingly, I dissent from the Court's judgment that denies such relief.[1]

## I

## A

Petitioner's first claim rests on his right to conflict-free assistance of counsel. As long ago as *Glasser* v. *United States,* 315 U. S. 60 (1942), this Court recognized that such assistance is a component of the Sixth Amendment right to effective assistance of counsel. *Id.*, at 70. This right is so fundamental in our adversarial system of criminal justice that public defender offices in many jurisdictions have rules pre-

---

[1] I agree with the Court's conclusion, *ante,* at 782, n. 5, that the Court of Appeals should be affirmed to the extent it held that any impermissible effect of the jury instruction on malice given at the guilt/innocence phase of trial was harmless beyond a reasonable doubt. See 785 F. 2d 890 (CA11), clarified, 796 F. 2d 1313 (1986). I also agree with the Court's observation, *ante,* at 779, n. 1, that petitioner has not advanced here the question of the constitutionality of executing a person for a murder committed while he was a minor, and thus there is no need to address the merits of that issue or the availability of the claim to petitioner in a future proceeding.

cluding representation of more than one of the criminal defendants involved in the same offense.[2]   Under the Federal Rules of Criminal Procedure[3] and under the rules governing professional responsibility,[4] consent of a criminal defendant

---

[2] In *Cuyler* v. *Sullivan*, 446 U. S. 335 (1980), this Court noted that the vast majority of public defender offices have a strong policy against multiple representation and that approximately half never undertake such representation.   *Id.*, at 346, n. 11; see also Lowenthal, Joint Representation in Criminal Cases: A Critical Appraisal, 64 Va. L. Rev. 939, 950, and n. 40 (1978).   We further observed in *Cuyler* that the private bar may be less aware of conflicts of interests in such instances.   446 U. S., at 346, n. 11. This observation certainly is supported by the testimony of petitioner's attorney in this case that he never even considered that a conflict might arise out of the representation of two defendants facing the death penalty for the commission of the same murder.   See App. 32–34.

[3] Criminal Rule 44(c) provides in relevant part:

"Whenever two or more defendants have been jointly charged . . . and are represented by . . . retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation."

[4] Ethical Canon 5–16 of the ABA Code of Professional Responsibility states:

"In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus, before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent."

Disciplinary Rule 5–105(D) states:

"If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment."

See also ABA Model Rules of Professional Conduct 1.7 and 1.10(a) (1984). The American Bar Association, in its Standards for Criminal Justice, explains:

"Except for preliminary matters such as initial hearings or applications for bail, *a lawyer or lawyers who are associated in practice* should not undertake to defend more than one defendant in the same criminal case if the

is a necessary prerequisite to joint representation, and trial court inquiry into whether the defendant has made a knowing and voluntary waiver of his right to conflict-free representation is strongly encouraged, if not required.[5]  I do not read

duty to one of the defendants may conflict with the duty to another.   The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several codefendants *except in unusual situations when, after careful investigation, it is clear that:*

"(i) no conflict is likely to develop;

"(ii) the several defendants give an informed consent to such multiple representation;

"(iii) the consent of the defendants is made a matter of judicial record.

"In determining the presence of consent by the defendants, the trial judge should make appropriate inquiries respecting actual or potential conflicts of interest of counsel and whether the defendants fully comprehend the difficulties that an attorney sometimes encounters in defending multiple clients.

"In some instances, accepting or continuing employment by more than one defendant in the same criminal case is unprofessional conduct." ABA Standards for Criminal Justice 4–3.5(b) (2d ed. 1979) (emphases in original).

In *Strickland* v. *Washington*, 466 U. S. 668 (1984), this Court stated that the Sixth Amendment relies upon the "legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions." *Id.*, at 688.   Where, as here, the legal profession's standards were not followed, no such presumption is appropriate.

[5] Subsequent to petitioner's trial, the Georgia Supreme Court, exercising its supervisory authority, adopted a rule that in capital cases codefendants *must* be provided with separate and independent counsel.   *Fleming* v. *State*, 246 Ga. 90, 270 S. E. 2d 185, cert. denied, 449 U. S. 904 (1980). The court cited the provision in the Code of Professional Responsibility that requires that any lawyer affiliated in a firm with a lawyer who is disqualified must also be disqualified, and thereby indicated that the rule applies to representation by a single attorney or by members of the same firm.   246 Ga., at 93, n. 7, 270 S. E. 2d, at 188, n. 7.   The court explained that a rule of separate and independent representation "is especially necessary where the death penalty is sought, because in these cases even a slight conflict, irrelevant to guilt or innocence, may be important in the sentencing phase."   *Id.*, at 93, 270 S. E. 2d, at 188; see also *id.*, at 95, 270 S. E. 2d, at 189 (Bowles, J., concurring) ("No two defendants share

the majority opinion as departing from the Court's earlier approval of those practices, see *Cuyler* v. *Sullivan*, 446 U. S. 335, 346, nn. 10 and 11 (1980), although I believe that in this case it definitely has misapplied the Sixth Amendment standard that is informed by the rules.

This Court recognizes the unique nature of claims that arise out of a conflict of interest and does not impose on such claims the two-pronged standard of inadequate performance and prejudice, see *Strickland* v. *Washington*, 466 U. S., at 687, that applies to general claims of ineffective assistance. Instead, prejudice is presumed if a defendant demonstrates that his attorney " 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Id.*, at 692, quoting *Cuyler* v. *Sullivan*, 446 U. S., at 350, 348.[6]

---

equal responsibility for a crime. Usually one is more culpable than the other or for any number of reasons has a greater degree of responsibility for what occurred. One may also be more entitled to leniency based on such factors as age, intelligence, motive, background, previous conduct or record, etc. Common counsel eliminates any practical possibility of plea bargaining"). But see *id.*, at 95, 97, 270 S. E. 2d, at 189, 191 (Hill, J., concurring specially) (cautioning that although presumption against joint representation is appropriate, a *per se* rule against joint representation may not be because capital defendants should be able to waive right to conflict-free representation if it would be to their benefit); *id.*, at 98, 270 S. E. 2d, at 191 (Jordan, P. J., dissenting) (arguing that defendant in that case should be permitted opportunity to make informed and voluntary waiver of right to conflict-free representation).

What happened in petitioner's case is therefore unlikely to be repeated in Georgia.

[6] The distinction between a prejudice showing and a showing of adverse effect on an attorney's performance apparently has been difficult for some courts to discern. See generally Note, Conflicts of Interest in the Representation of Multiple Criminal Defendants: Clarifying *Cuyler* v. *Sullivan*, 70 Geo. L. J. 1527, 1536–1561 (1982). The Court's decision in *Strickland* v. *Washington*, made clear, however, that demonstrating that a conflict adversely affected counsel's performance does not equate with the standard applied to general ineffectiveness claims that requires a showing that "there is a reasonable probability that, but for counsel's unpro-

The presumption of prejudice in cases presenting a conflict of interest that adversely affected counsel's performance is warranted because the duty of loyalty to a client is "perhaps the most basic" responsibility of counsel and "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland* v. *Washington*, 466 U. S., at 692. This difficulty in assessing prejudice resulting from a conflict of interest is due in part to the fact that the conflict may affect almost any aspect of the lawyer's preparation and presentation of the case. Because the conflict primarily compels the lawyer *not* to pursue certain arguments or take certain actions, it is all the more difficult to discern its effect. See *Holloway* v. *Arkansas*, 435 U. S. 475, 490 (1978) ("[I]n a case of joint representation of conflicting interests the evil . . . is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process" (emphasis in original)). The presumption of prejudice in conflict-of-interest cases is particularly appropriate because lawyers are charged with the knowledge that they are obliged to avoid such conflict. See n. 4, *supra.* A judge can avoid the problem by questioning the defendant, at an early stage of the criminal process, in any case presenting a situation that may give rise to conflict, in order to determine whether the defendant is aware of the possible conflict and whether he has waived his right to conflict-free representation.

### B

Although the Court purports to apply this conflict-of-interest ineffectiveness standard in the present case, see *ante*, at

---

fessional errors, the result of the proceeding would have been different." 466 U. S., at 694. The adverse-effect standard is necessary in conflict-of-interest cases to trigger the presumption of prejudice because such a presumption in these cases is of a more limited nature than the automatic presumption of prejudice that arises in cases of actual or constructive denial of the assistance of counsel altogether and cases of state interference with assistance of counsel. *Id.*, at 692.

783, I cannot agree with its conclusions. Contrary to the Court's reasoning, there simply can be no doubt that petitioner's court-appointed attorney actively represented conflicting interests through his role in the defenses of petitioner and his coindictee, Thomas Stevens. Defense counsel was appointed to represent petitioner, and his partner in their two-partner law firm was appointed to represent Stevens. App. 30–31. The two lawyers interviewed both defendants "from the beginning" and assisted in the preparation of both cases. *Id.*, at 32. The partner "sat in" with counsel at petitioner's trial and "helped" him. *Id.*, at 35. Apparently, others viewed the two lawyers as joint counsel for petitioner at his first trial inasmuch as the prosecutor directed the attention of the prospective jurors during *voir dire* to both lawyers and asked the jurors whether they ever had been represented by either of them. First Tr. 28, 37, 42, 48.[7] The partner is listed as appearing for petitioner Burger in the transcript of that trial. *Id.*, at 1. While there is no record evidence that petitioner's counsel assisted during Stevens' trial, counsel conceded that, in addition to his assistance in pretrial research, strategy, and interviews of Stevens, he prepared the appellate briefs for both petitioner and Stevens after the second sentencing proceedings. App. 54. See *Burger* v. *Kemp*, 753 F. 2d 930, 941 (CA11 1985) (District Court opinion, adopted by Court of Appeals as its own, noting that "it may be said that the two attorneys at times acted as one while each prepared for trial and appeal"). The facts therefore demonstrate that the two lawyer-partners actively represented both petitioner and Stevens.

This active representation of the two coindictees by petitioner's counsel constituted representation of actual conflict-

---

[7] The transcripts of petitioner's first trial, including his first sentencing hearing, and of his second sentencing hearing were submitted as Exhibit A and Exhibit C, respectively, to respondent's answer to petitioner's federal habeas corpus petition in District Court. See 1 Record, pleading 11. Citations to the transcript of the first trial and hearing are designated "First Tr." and citations to the second hearing are designated as "Second Tr."

ing interests.[8]   Petitioner's and Stevens' interests were dia-
metrically opposed on the issue that counsel considered to be
crucial to the outcome of petitioner's case—the comparative
culpability of petitioner and Stevens.   Petitioner confessed
to participation in the crime but placed the primary blame on
Stevens.   Second Tr. 278.   In his confession, petitioner
stated that he thought they simply would abandon the taxi-
cab.   *Ibid.*   Botsford, who had been with petitioner and Ste-
vens in the taxicab for a while, corroborated petitioner's
statement in his testimony at both petitioner's and Stevens'
trials.   When questioned about what petitioner and Stevens
had told him they were going to do with the taxicab and its
driver, Botsford replied:

> "Well, Tom Stevens said that he thought they should kill
> him.   And, I told him I thought he was crazy.   And,
> Burger didn't like the idea of killing him either.   Burger
> said that they ought to let him go, that they ought to
> drive off in the woods somewhere and let him out, and
> then take the car somewhere and put it like, I think
> somebody mentioned the ocean."   *Id.*, at 112–113; see
> also First Tr. 100, 111 (Botsford agreeing that petitioner
> "was just sorta going along, sorta doing sorta like Ste-
> vens was telling him to do").

Petitioner stated that after he had checked to see if the
driver was all right, Stevens returned to where they had
stopped the taxicab and told petitioner to drive the car into
the pond.   Second Tr. 278.   Stevens also confessed, but in

---

[8] The great degree of deference the Court accords the lower courts' con-
clusions on this matter, *ante*, at 784–785, and its emphasis on the "heavily
fact-based rulings," *ante*, at 785, appear misplaced in the analysis of this
case.   The question of multiple representation "is a mixed determination
of law and fact that requires the application of legal principles to the his-
torical facts," *Cuyler* v. *Sullivan*, 446 U. S., at 342, as are the general in-
effectiveness question and the "performance and prejudice components of
the ineffectiveness inquiry." *Strickland* v. *Washington*, 466 U. S., at 698.

doing so he pointed to petitioner as the more culpable. See *Stevens* v. *State*, 242 Ga. 34, 35, 247 S. E. 2d 838, 840 (1978). Stevens stated in his confession that he had not wanted to kill the taxicab driver and had not known that petitioner was planning to drive the automobile into the pond. *Ibid.* Stevens' attempt to argue his lesser culpability was his "sole mitigatory defense" at his second sentencing trial. See *Stevens* v. *State*, 245 Ga. 583, 585, 266 S. E. 2d 194, 197, cert. denied, 449 U. S. 891 (1980).

The Court disregards this direct conflict between petitioner's and Stevens' respective interests and, instead, attempts to minimize the active representation of both defendants by the two lawyer-partners. The Court opines that the "overlap of counsel" did not constitute an "active representation of competing interests" by petitioner's counsel. *Ante*, at 783. The Court supports this assertion by blandly relying on its perception of a shortage of lawyers to handle these cases, on its view of the benefits that defendants may derive from joint representation when there is a common defense, and on the assumption that lawyers are aware of their duty of loyalty to clients. *Ante*, at 783–784. The Court, however, does not identify any record evidence indicating that there were no other lawyers available for appointment. In addition, the other factors are of questionable relevance in this case which did *not* involve a common defense for the two coindictees and in which counsel did not even consider that a conflict of interest might exist.

The Court also points to the fact that petitioner and Stevens were tried separately and relies on the observation in *Cuyler* v. *Sullivan*, 446 U. S., at 347, that separate trials in that case had "reduced the potential for a divergence in [the defendants'] interests." *Ante*, at 784. The separate trials in this case, however, did absolutely nothing to reduce the potential for divergence of interests at the two critical stages that petitioner argues were adversely affected by the

conflict of interest, that is, pretrial plea negotiations and post-trial appeal.[9]

The Court's further attempt to disavow the existence of an actual conflict of interest by suggesting strategic reasons for the actions taken by petitioner's counsel on appeal and in pretrial negotiations is, with all respect, not supported by the record. The Court's suggestion that counsel's failure to make a "lesser culpability" argument on appeal was the result of a sound strategic conclusion that the claim was weak, *ante*, at 784, is sheer speculation. As demonstrated by petitioner's confession and Botsford's testimony, the lesser culpability argument certainly did not lack an evidentiary foundation. This speculation that counsel dropped the claim after trial because it was a weak argument for appeal is counterintuitive. The lesser culpability argument would

---

[9] The fact that defendants are given separate trials may eliminate some problems created by a conflict of interest, but severance does not alleviate numerous other dilemmas faced by lawyers representing two or more defendants charged and indicted together. See Developments in the Law, Conflicts of Interest in the Legal Profession, 94 Harv. L. Rev. 1244, 1380 (1981); Geer, Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, 62 Minn. L. Rev. 119, 143–144 (1978). The right to conflict-free representation by counsel in pretrial and appellate proceedings of criminal cases may be as significant as such representation at trial. *Id.*, at 125–127. In an earlier discussion of the hazards of an attorney's representing more than one coindictee, the Court described the very conflicts that present themselves in this case:

"Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, in this case it may well have precluded defense counsel . . . from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable. Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another." *Holloway* v. *Arkansas*, 435 U. S. 475, 489 (1978).

have been stronger on appeal than at trial. On appeal, the reviewing court had both cases before it at the same time and thus was in the actual position of being able to compare the cases at the time it reviewed the appropriateness of the sentences imposed.

Moreover, the speculation that counsel dropped the argument on appeal because of its weakness ignores the fact that comparative culpability is directly relevant to the statutorily mandated appellate review of capital cases in Georgia. The State's statute specifies that the Georgia Supreme Court's review of capital cases is to include consideration "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime *and the defendant.*" Ga. Code Ann. § 17–10–35(c)(3) (1982) (emphasis added). The evidence and argument presented at trial concerning petitioner's role as a follower of Stevens' directions and petitioner's lesser involvement in the assaultive behavior prior to the murder would clearly be relevant on appeal under the terms of the statute. Hence, even if counsel did base his decision on the "strategic" reason suggested by the Court,[10] that decision was based on an errone-

---

[10] Contrary to the Court's speculation, counsel himself did not claim to have dropped the lesser culpability argument because of its weakness. Rather, he stated that he did not raise the issue of the difference in the culpability of the two coindictees in petitioner's appellate brief because, although he thought it was the key issue at trial, App. 64, he thought "that was a jury decision based on the evidence," *id.*, at 53, and that the only way he could see to raise the issue was on the theory of "lack of evidence to sustain the finding of the jury as to the—what punishment to give." *Id.*, at 54. This basis for the action certainly cannot be considered strategically sound because it reflects an erroneous legal interpretation of appellate review in capital cases in Georgia. By failing to argue on petitioner's behalf that he was less culpable than Stevens, counsel diminished the reliability of the Georgia Supreme Court's proportionality review in this case. This Court has held that proportionality review is an important component of the Georgia capital-sentencing system. See *Gregg* v. *Georgia*, 428 U. S. 153, 198, 204–206 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). Therefore, even if counsel's assistance on appeal had not been hindered by

ous view of the law and thus could not be reasonable.[11]   See *Kimmelman* v. *Morrison*, 477 U. S. 365, 385 (1986) (counsel's judgment found to be contrary to prevailing professional norms because justifications offered by counsel reflected ignorance of the law or attempt to shift blame for inadequate preparation).

Setting aside the speculation as to counsel's motive, it becomes clear that his joint representation of petitioner and Stevens precluded him, as a matter of professional responsibility, from pursuing the lesser culpability argument in petitioner's appellate brief.   It would have been inconsistent with his duty of loyalty to Stevens to argue that the Georgia Supreme Court should reduce petitioner's sentence to life imprisonment because Stevens was the more culpable defendant who deserved the death sentence for this heinous murder.

It is difficult to imagine a more direct conflict than existed here, where counsel was preparing the appellate brief for petitioner at the same time that he was preparing the appellate brief for Stevens, and where the state statute specifies that one of the roles of that appellate process is to consider the comparative culpability and sentences of defendants involved in similar crimes.   Counsel's abandonment of the

---

an actual conflict of interest, one may well question whether his conduct in this regard met the minimal level of professional reasonableness.

[11] Counsel's self-serving declarations that he did not permit his representation of Stevens to affect his representation of petitioner cannot outweigh the conflict revealed by the record itself.   Counsel is not a fully disinterested party to this proceeding due to the collateral consequences that could result from a determination that he rendered ineffective assistance of counsel.   He certainly has an interest in disavowing any conflict of interest so that he may receive other court appointments that are a source of clients for the criminal defense work of the partners' practice.   App. 44.   The approximate $9,000 fee that counsel received in this case for his representation of petitioner was the largest the firm had ever received for a criminal case.   *Ibid.*   This payment, along with the payment received by the partner for his court appointment in the Stevens case, went into their firm account.   *Id.*, at 31.

lesser culpability argument on appeal, the stage at which the two cases would be reviewed contemporaneously, is indicative of the "'struggle to serve two masters.'" See *Holloway* v. *Arkansas*, 435 U. S., at 482, quoting *Glasser* v. *United States*, 315 U. S., at 75. This record *compels* a finding that counsel's representation of the conflicting interests of petitioner and Stevens had an adverse effect on his performance as petitioner's counsel.

Defense counsel's representation of conflicting interests also placed him in an untenable position at an earlier stage of the proceedings—during pretrial plea bargaining. The two partners helped each other during that period with their two cases and, as part of the pretrial preparation, petitioner's counsel talked with both petitioner and Stevens "from the beginning." App. 32. Counsel was not in a position to negotiate with the prosecution to the detriment of Stevens. Although he asserted that he continually attempted to negotiate with the prosecutor on behalf of petitioner for a sentence of life imprisonment, he conceded that he never offered the prosecutor petitioner's testimony against Stevens. *Id.*, at 52, 74–75. Certainly, counsel was not reasonable in expecting a plea bargain if he was not offering the prosecutor the most significant bargaining chip he possessed—petitioner's testimony against Stevens.[12]

---

[12] The Court discounts counsel's failure to offer the prosecutor petitioner's testimony against Stevens by stating that there is no indication that the prosecutor would have been receptive to the offer. *Ante,* at 785–786. The Court focuses on the strength of the evidence of petitioner's and Stevens' guilt and concludes that there is no reason to doubt that the prosecutor refused to discuss the matter prior to the first trial and insisted on seeking the death penalty after the remand of the case. *Ante,* at 786. This reasoning, however, misses the point of petitioner's argument. The question is whether the prosecutor would have insisted on seeking the death penalty against petitioner if counsel had attempted to persuade him otherwise by offering him petitioner's testimony against Stevens.

Although it is easy to assume that the prosecutor would not have indulged in plea bargaining in this case because of the significant evidence of

## C

I also disagree with the Court's rejection of petitioner's argument that the actual conflict of interest was aggravated by the widespread knowledge of the cases in the small area from which the jury was drawn. *Ante*, at 787–788. Juror knowledge that the two cases were being tried by local law part-

---

guilt, that approach ignores the reality of bargaining in capital cases. The evidence of guilt is not the only factor prosecutors consider. Rather, the relevant factors include the aggravating and mitigating circumstances surrounding the case as well as practical considerations such as the cost of pursuing the death penalty. See Gross & Mauro, Patterns of Death, 37 Stan. L. Rev. 27, 106–107 (1984) ("Since death penalty prosecutions require large allocations of scarce prosecutorial resources, prosecutors must choose a small number of cases to receive this expensive treatment"). Such practical considerations might weigh even more heavily prior to a second capital-sentencing trial on remand from the state appellate court's reversal of the first death sentence. Furthermore, there may be collateral evidentiary considerations during the pretrial phase that warrant a plea to life imprisonment for one coindictee in exchange for evidence that will strengthen the other case. For example, in this case, if the prosecutor had thought that there was a likelihood that petitioner's counsel might prevail on his argument that petitioner's confession should be suppressed, and if petitioner's counsel had offered petitioner's testimony against Stevens, the prosecutor might have decided that rather than risk the possibility of his case against petitioner being destroyed by suppression of his confession, he would permit petitioner to plead to a life sentence in exchange for his testimony against Stevens and pursue the death sentence against Stevens.

Petitioner's attorney had the duty to serve his role in the adversary system and make an offer on petitioner's behalf to testify against Stevens if petitioner was willing to do so, and thereby avoid the possibility of being executed. Petitioner's burden of showing that the conflict of interest adversely affected his counsel's performance therefore was met. The Court's suggestion that whether the prosecutor would have accepted such an offer is the determinative factor verges on requiring a showing of prejudice which, of course, is inappropriate in the context of petitioner's conflict-of-interest claim. See n. 6, *supra*. Counsel's complete failure to offer petitioner's testimony against Stevens in a capital case of this nature where petitioner's lesser culpability was suggested not only by his own confession but was corroborated by testimony of the key witness, has to be below minimal professional standards.

ners on inconsistent theories could create a conflict of interest because, in order to preserve the credibility of their argument in either case, the lawyers would have to deny the validity of their contradictory approach in the other. A crucial feature in any case is the credibility of a defendant's lawyer in the minds of the jury.

The Court's observation that "the community would have had the same awareness that the theories were inherently inconsistent" if two unaffiliated lawyers had advanced the inconsistent defenses, *ante*, at 788, may well be true, but it says nothing of the difference that awareness could make in the community's view of the cooperating lawyer-partners' credibility. The Court fails to recognize that, although the credibility of two unaffiliated attorneys presenting inconsistent arguments would not be questioned, the credibility of two local law partners assisting each other in the two cases could well be questioned if it was known that the lawyers working together presented inconsistent theories in the separate cases. Obviously, a jury might suspect that, in one of the cases, the lawyers were pressing an argument they did not believe to be true.

The adverse effect of this conflict on credibility would have been magnified when petitioner's and Stevens' cases were remanded for the second sentencing proceeding and the blame-shifting arguments were repeated. By the time of the second sentencing hearing, the verdicts in the original trials and sentencing proceedings had become known to the community.[13] Where, as here, the community was aware that

---

[13] Counsel testified that there were several newspaper accounts of the proceedings between the first and second sentencing hearings and that he was certain that the people in the community were aware of the sentence received at the first trial. App. 55. The record indicates that 23 out of the 35 persons who were asked during *voir dire* at the second sentencing hearing whether they had heard about the first trial responded affirmatively. Second Tr. 33–34, 40, 48. Counsel made no effort to question these prospective jurors about the extent of their knowledge of the earlier trials and whether it extended to the theories on which petitioner's and

the same law partners together were representing two defendants in capital cases and that they were arguing inconsistent theories that placed the blame on that defendant who did not happen to be on trial at the moment, the lawyers' credibility and their effectiveness as counsel were significantly undermined.

### D

Finally, I conclude that the trial court in this case erred in failing to inquire into whether petitioner knowingly and voluntarily had waived his constitutional right to conflict-free representation. When this Court, in its opinion in *Cuyler* v. *Sullivan*, addressed the question of the state trial court's duty to make such an inquiry, it specified: *"Unless the trial court knows or reasonably should know that a particular conflict exists*, the court need not initiate an inquiry." 446 U. S., at 347 (emphasis added). Here, the trial judge, who appointed the two defense counsel and who presided over both petitioner's trial and Stevens' trial, should have known of the conflict from the outset inasmuch as the two confessions, given before the two partners were appointed, were in direct conflict on the question as to which defendant was the prime architect of the crime. In any event, by the time the appeal was taken, the trial court, undoubtedly familiar with the role that comparative culpability plays in appellate review of capital cases under the Georgia statute, was well aware that the primary defense of each defendant against the death sentence was that the other was more culpable. It therefore was the court's obligation to inquire whether petitioner had consented to the joint representation with the knowledge of the possible conflicts of interests. See *Glasser* v. *United States*, 315 U. S., at 71 ("The trial court should protect the right of an accused to have the assistance of coun-

---

Stevens' trials had been argued. Counsel also testified, in explanation of his failure to seek a change of venue, that he had expected that the jurors who sat at petitioner's trial would be aware of all the pretrial proceedings, including an unsuccessful effort for change of venue. App. 54–55.

sel"). The court could not properly rely on an assumption that petitioner had given knowing and voluntary consent once the judge became aware of the actual conflict, particularly where he was made aware during the suppression hearing that petitioner was a 17-year-old at the time of the appointment of counsel, had an IQ of 82, functioned at the level of a 12-year-old, and was diagnosed as having psychological problems. First Tr. 244, 245, 247–248.

## II

Even if no conflict of interest existed in this case, I would still dissent from the Court's denial of relief because petitioner was deprived of the effective assistance of counsel in connection with his capital-sentencing proceeding. His counsel failed to investigate mitigating evidence and failed to present any evidence at the sentencing hearing despite the fact that petitioner was an adolescent with psychological problems and apparent diminished mental capabilities. I agree with the Court that the adversarial nature of Georgia's capital-sentencing proceedings is sufficiently similar to a trial that petitioner's claim is governed by the same standards that apply to general claims of ineffective assistance of counsel at trial. *Ante,* at 788; see *Strickland* v. *Washington,* 466 U. S., at 686–687. It is also important to "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.,* at 690. Applying that standard to petitioner's claim in light of the record of this case yields a finding that the inaction by petitioner's lawyer was "outside the wide range of professionally competent assistance" and was prejudicial to petitioner. *Id.,* at 690, 692.

In *Strickland,* this Court specifically addressed counsel's duty to investigate. It explained:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after

> less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*, at 690–691.

See also *Kimmelman* v. *Morrison*, 477 U. S. 365 (1986). The limitation counsel placed on his investigation of the evidence of petitioner's mental capabilities and psychological makeup despite the indications that petitioner had problems in these respects was not supported by reasonable professional judgment.

Counsel stated that he based his decision not to move the court for a complete psychological examination of petitioner on his prior experience with the mental hospital where, he assumed, petitioner would be sent for the examination. App. 62–63. He stated that "the results I've had with personnel at Central Hospital as far as the defense is concerned . . . hasn't been good at all." *Id.*, at 63. He added that he thought that any further examinations would yield the same psychopathic diagnosis reached by the psychologist who had examined petitioner once briefly and primarily to administer an IQ test for purposes of the hearing on whether petitioner's confession was admissible. *Ibid.*

Counsel's failure to request an examination because of what he considered to be a biased procedure constituted a breakdown in the adversarial process. If in fact the procedure for psychological examinations of an indigent criminal defendant in that jurisdiction was biased, the role of petitioner's counsel at least was to seek an alternative examination process or to challenge the biased procedure. Counsel's decision to forgo the psychological examination imperiled

petitioner's ability to counter the prosecutor's argument that he deserved to be executed for his role in the murder and therefore undermined the reliability of the sentencing proceeding. Moreover, such a decision to proceed without the examination in a case in which an adolescent with indications of significant psychological problems and diminished mental capabilities faces the death penalty is contrary to professional norms of competent assistance. The usefulness of a thorough evaluation in a case where there are indications that the capital defendant has problems of that kind is obvious. See *Eddings* v. *Oklahoma,* 455 U. S. 104, 116 (1982); cf. *Ake* v. *Oklahoma,* 470 U. S. 68 (1985).

Counsel's decision not to investigate petitioner's family or childhood background also was not within the range of professionally reasonable judgment. Viewed as of the time he decided not to get in touch with any family member or to investigate any place where petitioner had lived, counsel provided inadequate assistance. He relied on petitioner to suggest possible witnesses or mitigating evidence. But his question to petitioner whether he could produce evidence of "anything good about him," App. 51, hardly could be expected to yield information about petitioner's childhood and broken home. It is unlikely that in response to that question a defendant would volunteer the facts that his father threw him out of the house, that his mother did the same, that his stepfathers beat him and his mother, or that one stepfather involved him in drugs and alcohol at age 11. All this is mitigating evidence that could be highly relevant. See *Eddings* v. *Oklahoma,* 455 U. S., at 107. Furthermore, counsel testified that he spoke with petitioner perhaps "half a dozen times," the longest being "[p]robably about an hour." App. 51. These bare six hours provided counsel little time to discuss possible mitigating evidence for the sentencing proceeding because counsel surely also had to discuss in detail the circumstances surrounding petitioner's confession which he was challenging and all the other features of the

guilt/innocence phase of the trial. Moreover, after petitioner's death sentence was vacated on appeal and the case was remanded, counsel did not perform any further investigation whatsoever during the 9-month period before the second hearing. He simply proceeded in the same manner that had resulted in petitioner's being sentenced to death at the first hearing. *Id.*, at 71.

The only reason counsel spoke to petitioner's mother at all was because she sought him out after learning elsewhere that her son was charged with murder. *Id.*, at 83. Even after petitioner's mother initiated the contact, counsel's conduct was inexplicable. He testified that he never explained the penalty phase of the trial to petitioner's mother or what evidence then could be presented. *Id.*, at 50. The Court finds reasonable counsel's decision not to have petitioner's mother testify because he concluded that her testimony might be counterproductive in that it might reveal a petty offense petitioner had committed. *Ante*, at 792. That decision is a prime example, however, of a strategic choice made after less-than-adequate investigation, which therefore is not supported by informed professional judgment. Counsel could not reasonably determine whether presenting character witnesses would pose a risk of disclosing past criminal behavior by petitioner without first determining whether there was any such criminal behavior. Although there is a reference in the record to an incident of shoplifting a candy bar, App. 90–91, and another reference to an automobile accident, *id.*, at 92–93, there is no indication that counsel ever determined whether petitioner in fact had a prior criminal record. The account provided by petitioner's mother of petitioner's hitchhiking to Florida to be with her after having been thrown out of his father's house and having to sell his shoes during the trip to get food, *id.*, at 92, may well have outweighed the relevance of any earlier petty theft.

I also find troubling the fact that defense counsel rejected the assistance of another lawyer (who had known petitioner)

merely on the basis that the lawyer was black.  *Id.*, at 57–58. The lawyer offered to come to Georgia at his own expense to provide what assistance he could.  *Id.*, at 86.  Counsel thought his assistance might have "an ill effect," however, on the trial of petitioner who is white.  Counsel testified that he and the lawyer agreed that because of his race it was not wise to have the lawyer testify.  *Id.*, at 58.  I question whether this is a reasonable professional decision.  The adversarial duty of petitioner's counsel was to pursue a means by which to present testimony from such a witness while doing his best to safeguard the trial from racial prejudice. See, *e. g.*, *Turner* v. *Murray*, 476 U. S. 28 (1986).  Counsel apparently made no effort to investigate possible racial bias of petitioner's jury.  App. 58–59.  Like counsel's abandonment of the psychological investigation because of the suspected unfairness of the examination procedure, his surrender to the perceived risk of racial discrimination without any effort to eliminate that risk is inconsistent with his adversarial role and his responsibility to further the reliability of the court proceeding.

Acceptance of the unpleasant likelihood of racial prejudice in such a trial, however, does not justify counsel's failure to accept assistance from the lawyer in any number of ways, such as investigating petitioner's childhood background in Indianapolis where the lawyer had known petitioner.  Testimony by petitioner's mother at the federal habeas corpus hearing revealed that when the lawyer was in law school he had worked in a volunteer "big brother" organization for men who spent time with children who did not have a father-son relationship or a big brother.  *Id.*, at 85.  He was undoubtedly familiar with some of petitioner's friends and family members there.  The affidavits submitted at the federal hearing, 1 Record 139–157, indicate that many of those persons still reside in Indianapolis but were never approached by counsel.  In sum, I reluctantly conclude that counsel fell short in his "duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary." *Strickland* v. *Washington,* 466 U. S., at 691. Application of the *Strickland* standard to this case convinces me that further investigation was compelled constitutionally because there was inadequate information on which a reasonable professional judgment to limit the investigation could have been made.[14]

Having concluded that the conduct of petitioner's lawyer in failing to pursue an investigation into petitioner's psychological problems or into his family and childhood background was professionally unreasonable, given the circumstances known to counsel at the time, I must also address the question whether this inadequate performance prejudiced petitioner. In my view, if more information about this adolescent's psychological problems, troubled childhood, and unfortunate family history had been available, "there is a reasonable probability that . . . the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland* v. *Washington,* 466 U. S., at 695.

I cannot refrain from remarking on the similarities between the evidence of petitioner's childhood and that presented in *Eddings* v. *Oklahoma,* 455 U. S., at 107. Recognizing there the force of such evidence in a decision whether an individual should be sentenced to die, this Court held that the death sentence had to be vacated and the case remanded for another sentencing proceeding where the sentencing authority would consider the mitigating evidence. *Id.,* at 115–117. Because the decision not to present such

---

[14] I agree with the observation in the dissenting opinion in the Court of Appeals that the defense "strategy" to make the prosecutor "prove his case," see App. 35, "is tantamount to no strategy at all; and reliance upon such a strategy in a capital sentencing proceeding, as an alternative to investigating and presenting available mitigating evidence, is patently unreasonable." *Burger* v. *Kemp,* 753 F. 2d 930, 946 (CA11 1985).

evidence to the sentencing authority in petitioner's case was not supported by reasonable professional judgments, the reliability of the capital-sentencing proceeding was undermined. But for defense counsel's disinterest in developing any mitigating evidence to permit an informed decision, there is a reasonable possibility that the outcome of the sentencing hearing would have been different. Counsel's conduct "so undermined the proper functioning of the adversarial process" that the sentencing hearing cannot "be relied on as having produced a just result." *Strickland* v. *Washington*, 466 U. S., at 686.

## III

Petitioner was denied the effective assistance of counsel guaranteed by the Sixth Amendment due to his trial counsel's active representation of the conflicting interests of his co-indictee. Given the indications of petitioner's psychological problems and diminished mental capabilities known to petitioner's lawyer, counsel's failure to perform an investigation into those problems and into petitioner's background denied petitioner effective assistance of counsel at his capital-sentencing hearing. Petitioner is entitled to a new trial with conflict-free representation by counsel and to a new capital-sentencing hearing with effective assistance of counsel. I respectfully dissent from this Court's judgment denying relief.

JUSTICE POWELL, with whom JUSTICE BRENNAN joins, dissenting.

I join Part II of JUSTICE BLACKMUN's dissenting opinion. I would reverse the judgment of the Court of Appeals on the ground that counsel unreasonably failed to investigate and present to the sentencing jury available mitigating evidence that would have raised a substantial question whether the sentence of death should have been imposed on a seriously backward minor. I therefore do not reach the question whether there was a conflict of interest resulting from the fact that two law partners represented Burger and Ste-

vens in their separate trials. I write separately to emphasize those aspects of Burger's claim that I find particularly troubling.

I

When he committed the crime for which he is now to be executed, Burger's physical age was 17 years. He had an IQ of 82, was functioning at the level of a 12-year-old, and possibly had suffered brain damage from beatings when he was younger. See *Burger* v. *Kemp*, 753 F. 2d 930, 957 (CA11 1985) (Johnson, J., dissenting). Testimony by Burger's mother at the federal habeas corpus hearing confirmed that his childhood was turbulent and filled with violence. App. 88–92; see *ante*, at 789–790. Affidavits from Burger's childhood friends also attested to his troubled upbringing. See *ante*, at 793.

Defense counsel knew something of these facts, although not the details. App. 51–52. Prior to the sentencing hearing, counsel had interviewed Burger, Burger's mother, and an attorney who had befriended Burger and his mother. He had also reviewed psychologists' reports provided by Burger's mother, and spoken to the psychologist who testified as to Burger's IQ and psychological maturity at the suppression hearing. 753 F. 2d, at 935. After this review, counsel made the judgment that presenting any evidence at sentencing in addition to Burger's chronological age and the facts of his degree of participation in the crimes "would not be to [Burger's] benefit." App. 49. See 753 F. 2d, at 935.[1]

---

[1] Counsel testified:

"I felt the way to try that case was to take the evidence that was there and try to minimize Mr. Burger's participation in the crime. . . . I felt that case should have been tried on the facts and make the District Attorney—I say make him, use whatever rules of evidence to exclude those harmful facts, and then use the—my opinion in representing Burger was then use those facts to show that he was just there and was not entitled to be treated in the same manner as the person who was—who was the main actor in the thing. That he was a secondary, he was in a secondary position. Since there were two punishments in that particular situation, that he should be

## II

In *Strickland* v. *Washington*, 466 U. S. 668 (1984), this Court held that a "defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Id.*, at 687. First, the defendant must show that counsel's errors were so serious that his performance as the "counsel" guaranteed under the Sixth Amendment was deficient. Second, the defendant must show that he suffered prejudice because of counsel's performance. In the context of a capital sentence, the defendant must demonstrate "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*, at 695.

### A

In assessing the adequacy of counsel's performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*, at 690. But "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*, at 690–691. Here, counsel did not believe that evidence of Burger's violent and disturbed family background would benefit his client because Burger "had been involved in a beating and a number of things that indicated violence and stuff at an earlier [age]." App. 49. Counsel's reason for not presenting the sentencing jury with evidence of Burger's mental and emotional imma-

given the lesser of the two. I think that's the way that case should have been tried, and that's the way I tried it. And, I don't know of—today, if I had to go back and try it again I would do it in the same manner—I say in the same manner, much the same manner, using the same thing and hope I got a different jury. That's all. And, that's it." App. 63–64.

turity is ambiguous.[2]   It appears that counsel believed that the only relevant testimony in mitigation of a capital sentence could have been "something like he was a good boy and went to church." *Id.*, at 63.   Most telling is counsel's explanation of the type of mitigating evidence that would be relevant at the sentencing hearing: "anything good about him, anything—of course, it was my understanding that that is very broad.   That you can generally put up anything you can find that is good about anybody in mitigation of the sentence." *Id.*, at 51.

Burger's stunted intellectual and emotional growth and the details of his tragic childhood are far from "good," and it is true that background information would have "indicated violence and stuff at an earlier [age]," *id.*, at 49.   But this Court's decisions emphasize that mitigating evidence is not necessarily "good."   Factors that mitigate an individual defendant's moral culpability "ste[m] from the diverse *frailties* of humankind." *Woodson* v. *North Carolina,* 428 U. S. 280,

---

[2] Counsel testified:

"The particular psychologist I had was—gave Mr. Burger an I. Q. test and found it to be 82.   And, he also was of the opinion that Mr. Burger was a sociopath with a psychopathic personality.   And, on cross examination in the confession phase, this attorney asked, he commented to the effect, I can't remember the exact comment, sociopath was not crazy, he didn't belong in an insane asylum, and he wasn't—shouldn't be treated as a criminal because of his compulsive behavior.   But, made something—well, you can't put them in an insane asylum because they will let him out.   Didn't know what to do with him.   I felt that would be—that and related questions would be asked in the presence of the jury, so I decided at that point not to use the testimony of the psychologist in that phase." *Id.*, at 62.

When asked whether he considered using a psychologist for something other than showing that Burger's confession was involuntary, counsel responded:

"I could have—if he had been of the opinion, you know, question of sanity, I could have used that instance, but he was not of that opinion.   I did not see the benefit of going out and trying to find the sociologist, or psychologist to use in that particular trial in that particular place, because I did not think that that would be effective." *Id.*, at 63.

304 (1976) (plurality opinion of Stewart, POWELL, and STE-
VENS, JJ.) (emphasis added).   In a capital case where the de-
fendant is youthful—in fact, a child, measured by chronologi-
cal,[3] emotional, or intellectual maturity—evidence of these
facts is extraordinarily germane to the individualized inquiry
that the sentencing jury constitutionally is required to per-
form.   "[E]vidence of a turbulent family history, of beatings
by a harsh father, and of severe emotional disturbance is par-
ticularly relevant," *Eddings* v. *Oklahoma*, 455 U. S. 104, 115
(1982), "because of the belief, long held by this society, that
defendants who commit criminal acts that are attributable
to a disadvantaged background, or to emotional and mental
problems, may be less culpable than defendants who have no
such excuse."   *California* v. *Brown*, 479 U. S. 538, 545
(1987) (O'CONNOR, J., concurring).   See *Zant* v. *Stephens*,
462 U. S. 862, 885 (1983) (defendant's mental illness perhaps
should mitigate the penalty).   This Court's previous obser-
vation bears emphasis:

> "[Y]outh is more than a chronological fact.   It is a time
> and condition of life when a person may be most suscepti-
> ble to influence and to psychological damage.   Our his-
> tory is replete with laws and judicial recognition that
> minors, especially in their earlier years, generally are
> less mature and responsible than adults.   Particularly
> 'during the formative years of childhood and adoles-
> cence, minors often lack the experience, perspective,
> and judgment' expected of adults.   *Bellotti* v. *Baird*, 443
> U. S. 622, 635 (1979)." *Eddings* v. *Oklahoma, supra*,
> at 115–116 (footnotes omitted).

See *Gallegos* v. *Colorado*, 370 U. S. 49, 54 (1962) (a 14-year-
old "cannot be compared with an adult" when assessing the
voluntariness of a confession).   Where a capital defendant's

---

[3] Although an individual may be held criminally responsible at the age
of 13, Ga. Code Ann. § 16–3–1 (1984), the age of legal majority in Georgia is
18 years, § 39–1–1 (1982).

chronological immaturity is compounded by "serious emotional problems, . . . a neglectful, sometimes even violent, family background, . . . [and] mental and emotional development . . . at a level several years below his chronological age," *id.*, at 116, the relevance of this information to the defendant's culpability, and thus to the sentencing body, is particularly acute. The Constitution requires that a capital-sentencing system reflect this difference in criminal responsibility between children and adults.

Where information at the sentencing stage in a capital case may be highly relevant, counsel's burden of justifying a failure to investigate or present it is similarly heightened. There is no indication that counsel understood the relevance, much less the extraordinary importance, of the facts of Burger's mental and emotional immaturity, and his character and background, that were not investigated or presented in this case. This evidence bears directly on Burger's culpability and responsibility for the murder and in fact directly supports the strategy counsel claimed to have deemed best—to emphasize the difference in criminal responsibility between the two participants in the crime. Absent an explanation that does not appear in this record, counsel's decision not to introduce—or even to discover—this mitigating evidence is unreasonable, and his performance constitutionally deficient.[4]

---

[4] As the Court notes, *ante*, at 779–780, Alvin Leaphart, the appointed counsel who represented petitioner in the state courts, was an experienced and respected lawyer. In concluding there was ineffective assistance in this case, I do not question the Court's view. Any lawyer who has participated in litigation knows that judgment calls—particularly in a trial—cannot always be reasonable or correct. Moreover, this Court has not yet addressed the question presented in *Thompson* v. *State*, 724 P. 2d 780 (Okla. Crim. App. 1986), cert. granted, 479 U. S. 1084 (1987), whether the Eighth Amendment imposes an age limitation on the application of the death penalty. See *Eddings* v. *Oklahoma*, 455 U. S. 104, 110, n. 5 (1982).

I also share the concern expressed by Judge Edenfield in *Blake* v. *Zant*, 513 F. Supp. 772, 802, n. 13 (SD Ga. 1981), that the routine raising of charges of ineffective assistance of counsel is likely to have a significant

## B

Imposing the death penalty on an individual who is not yet legally an adult is unusual and raises special concern.[5] At

"chilling effect" on the willingness of experienced lawyers to undertake the defense of capital cases. See *ante*, at 780, n. 2. In this case, however, I conclude that the facts and circumstances that no one now disputes clearly show that counsel made a serious mistake of judgment in failing fully to develop and introduce mitigating evidence that the Court concedes was "relevant" and that the jury would have been compelled "to consider." See *ante*, at 789, n. 7.

[5] We noted in *Eddings* v. *Oklahoma* that "[e]very State in the country makes some separate provision for juvenile offenders." 455 U. S., at 116, n. 12 (citing *In re Gault*, 387 U. S. 1, 14 (1967)). Of the 37 States that have enacted capital-punishment statutes since this Court's decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), 11 prohibit the execution of persons under 18 at the time of the offense. Three States·impose a prohibition at age 17, and Nevada sets its limit at age 16. Streib, The Eighth Amendment and Capital Punishment of Juveniles, 34 Cleveland State L. Rev. 363, 368–369, and nn. 33–36 (1986). Of the States permitting imposition of the death penalty on juveniles, over half of them explicitly denominate youth as a mitigating factor. The American Law Institute's Model Penal Code capital-punishment statute states an exclusion for defendants "under 18 years of age at the time of the commission of the crime." § 210.6(1)(d) (1980). The Institute reasons "that civilized societies will not tolerate the spectacle of execution of children, and this opinion is confirmed by the American experience in punishing youthful offenders." *Id.*, Comment, p. 133. In 1983, the American Bar Association adopted a resolution stating that the organization "oppo[ses], in principle, the imposition of capital punishment on any person for an offense committed while that person was under the age of 18." See ABA Opposes Capital Punishment for Persons under 18, 69 A. B. A. J. 1925 (1983).

International opinion on the issue is reflected in Article 6 of the International Covenant on Civil and Political Rights and the American Convention on Human Rights. See United Nations, Human Rights, A Compilation of International Instruments 9 (1983). See also Weissbrodt, United States Ratification of the Human Rights Covenants, 63 Minn. L. Rev. 35, 40 (1978). Both prohibit the execution of individuals under the age of 18 at the time of their crime. The United States is not a party to either of these treaties, but at least 73 other nations have signed or ratified the International Covenant. See Weissbrodt, *supra*. All European countries forbid imposition of the death penalty on those under 18 at the time of their

least, where a State permits the execution of a minor, great care must be taken to ensure that the minor truly deserves to be treated as an adult. A specific inquiry including "age, actual maturity, family environment, education, emotional and mental stability, and . . . prior record" is particularly relevant when a minor's criminal culpability is at issue. See *Fare* v. *Michael C.*, 442 U. S. 707, 734, n. 4 (1979) (POWELL, J., dissenting). No such inquiry occurred in this case. In every realistic sense Burger not only was a minor according to law, but clearly his mental capacity was subnormal to the point where a jury reasonably could have believed that death was not an appropriate punishment. Because there is a reasonable probability that the evidence not presented to the sentencing jury in this case would have affected its outcome, Burger has demonstrated prejudice due to counsel's deficient performance.

## III

As I conclude that counsel's performance in this case was deficient, and the deficiency may well have influenced the sentence that Burger received, I would vacate Burger's death sentence and remand for resentencing.

---

offense. Streib, *supra,* at 389 (citing Amnesty International, The Death Penalty (1979)).