IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2003

## QUINCY HENDERSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County
No. P-23965      W. Otis Higgs, Judge**

---

**No. W2002-02541-CCA-R3-PC  - Filed March 15, 2004**

---

The petitioner, Quincy Henderson, appeals the Shelby County Criminal Court's dismissal of his post-conviction petition, in which he claimed that his second degree murder conviction was constitutionally infirm because of ineffective assistance of trial counsel.  Upon our review of the record, the parties' briefs, and the applicable law, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Larry Copeland, Jr., Memphis, Tennessee; and Paul K. Guibao, Memphis, Tennessee, for the Appellant, Quincy Henderson.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Michelle Kimbrill, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

A jury convicted the petitioner of the 1995 first degree premeditated murder of Demetrius Moten.  On appeal, this court modified the conviction to second degree murder and remanded the case for resentencing. *See State v. Quincy L. Henderson*, No. 02C01-9706-CR-00227 (Tenn. Crim. App., Jackson, May 12, 1998) (*Quincy Henderson I*).  On remand, the trial court sentenced the petitioner to an incarcerative term of 20 years, and on appeal, this court affirmed the sentence. *See State v. Quincy Henderson*, No. 02C01-9901-CR-00003 (Tenn. Crim. App., Jackson, Nov. 29, 1999) (*Quincy Henderson II*) .

The petitioner filed a petition for post-conviction relief, claiming constitutionally deficient representation by trial counsel. Following an evidentiary hearing, the post-conviction court denied relief, and the petitioner now appeals that determination.

A summary of the convicting evidence is extracted from this court's opinion in *Quincy Henderson I*:

On July 7, 1995, Demetrius Moten . . . was observed at a neighborhood bar and grill, known by the local residents as "Sam's Club." While in the club, Julius Moten, Demetrius' father, saw his daughter drinking a beer at the club with some of her cousins and friends. He recalled that he instructed his daughter to go home to her children.

Between 8:30 and 9:00 p.m., William Baker and Yolanda Cribbs each saw Demetrius and the appellant leaving Sam's Club together. The two were walking toward the Dunnavant Manor Apartments. Demetrius was carrying a brown paper bag in her left hand. "[The appellant] put his arm around her . . . like . . . hugging, but no . . . she wasn't hugging back." From across the street, Baker overheard the two discussing a ten dollar bill and observed that the appellant appeared to be attempting to take the brown paper bag away from Demetrius. Ms. Cribbs stated that "they were not fighting or struggling in any way." She explained that it appeared as if the appellant and Demetrius were hugging, and, because she knew they were friends, she did not think anything about it. Baker also noticed that the appellant was wearing white, black, and green Nike tennis shoes. Both Baker and Cribbs watched the two walk toward the Dunnavant Manor Apartments, but neither noticed whether they ever entered an apartment.

. . . .

The next morning, between 7:30 and 8:30 a.m., Jerry Herron and Orange Williams . . . search[ed] for Demetrius when they realized that she had never returned from Sam's Club. The two men found the lifeless body of Demetrius Moten in the woods behind the Dunnavant Manor Apartments. The Memphis Police Department was then notified.

. . . Although there were no eyewitnesses to the apparent homicide, the information provided by the witnesses placed the appellant as the last person seen with Demetrius Moten the previous evening. Based upon this information, Memphis police officers proceeded to the appellant's residence.

Upon obtaining a consent to search by the appellant's mother, Addie Henderson, police officers found a pair of white, green and black Nike tennis shoes soaking in a bucket of bleach and dishwashing liquid in the sink. They also discovered a bloody sock in a garbage can. The appellant was then transported to the homicide bureau of the Memphis Police Department.

After waiving his constitutional rights, the appellant provided a statement to the police in which he confessed to the murder of Demetrius Moten. In his confession, the appellant explained that he had asked Demetrius if she wanted to have sex and she responded that she did. The two then went into the woods behind the Dunnavant Manor Apartments. After engaging in sexual intercourse, the appellant asked Demetrius for a dollar, to which she responded, "Ain't fixing to give you shit." The appellant asked again, and this time, Demetrius gave the appellant what she thought was a one dollar bill, but was actually a ten dollar bill. When she realized her mistake, Demetrius asked the appellant to return the ten dollar bill. A fight ensued between the two.

> That's when I took the stick – the first time I hit her with the stick. And after I hit her with the stick, I got scared, and I didn't know what to do. That was about all by then. I got scared, continuously hitting her. So, when I heard this dude – I heard some guy holler "Peaches," and I ran home.

He explained that, at the time of the encounter with Demetrius, he was under the influence of "[a] lot of alcohol, just a little weed." The appellant, at some point later in the evening, purchased "some weed" with the money he took from the victim. In his statement, the appellant also informed the detectives of the location of the "stick" used in the murder. Subsequent police investigation confirmed the location of the "stick."

An autopsy was performed on the victim's body [and revealed that she had] suffered "blunt trauma to her head and neck," resulting in her death.

*Quincy Henderson I*, slip op. at 2-6 (footnotes omitted).

At the post-conviction hearing, Addie Henderson, the petitioner's mother, testified for the petitioner that she hired trial counsel to defend her son on the murder charge. She testified

that counsel belatedly filed unspecified pretrial motions and neglected to call witnesses whose names Ms. Henderson provided. She testified that she made a videotape of the murder scene that showed an absence of blood at the scene and that trial counsel neglected to introduce it at trial. She claimed that trial counsel neglected to inspect the physical evidence, including a sock found at the petitioner's home, and that trial counsel failed to exploit a letter written by the victim's father in which he allegedly opined that he disbelieved the petitioner was guilty. Ms. Henderson testified that counsel failed to pursue Ms. Henderson's claim that a bailiff had prejudicial conversations with the trial jury. Ms. Henderson testified that she met with counsel "[a]bout a hundred times."

On cross-examination, Ms. Henderson admitted that at trial the state called the witnesses whose names she had given to counsel. Ms. Henderson admitted she had testified at trial as an alibi witness that the petitioner was at home with her at the time of the murder.

The petitioner testified at the evidentiary hearing that he had a ninth-grade education; he had trouble reading and dropped out of school at his mother's request to care for a 100-year-old, bedridden grandmother. His trial attorney did not inquire into his school history and did not discuss with him the possibility of obtaining a psychiatric evaluation. He testified that counsel was unaware that he had attempted suicide. He testified that prior to trial he met with counsel six or seven times.

On cross-examination, the petitioner testified that he completed high school through a correspondence course while in prison; however, the petitioner admitted that his brother was "the one who took the school for [him]. . . . He did the work for me." The petitioner admitted that, at trial, he testified that he had completed the correspondence course. The petitioner further denied that he had confessed to the murder, and when shown the signed confession, he denied that the signature was his.

On redirect examination, the petitioner testified that, at trial, he informed counsel that a state witness, William Baker, had accosted the petitioner shortly before the victim's murder about the petitioner dating Baker's girlfriend. He testified that counsel failed to cross-examine Baker about the issue. Also, he testified that counsel failed to call an alibi witness, "O.W.," who, the petitioner testified, saw the petitioner going home on the night of the murder.

Next, John Billings testified for the petitioner that he was a licensed private investigator who worked for the defense on the petitioner's murder case. He testified that he reported to defense counsel that the victim had a reputation for using drugs and serving as a prostitute. He also reported to counsel that the man who found the victim's body had said that, prior to finding the victim, he had dreamed that "she was out there among the cut."[1] Mr. Billings testified that he was not directed to investigate the defendant's background, school history, or psychological status.

---

[1]The "cut" was apparently the term used for the area behind the apartment building where the victim's body was found.

The petitioner's trial counsel testified that, prior to the petitioner's case, she had handled no first degree murder cases, although she had "a lot of experience in felony work," including a sixteen-month trial in federal court. Although she did not want to take the petitioner's case, one of her partners asked her to do so. She testified that, when she took the case, the petitioner was firm that he did not commit the crime and that his confession was coerced. She testified that this position dictated her defense strategy.

She reviewed the state's "discovery packet." She admitted that she did not get the photographs until the first day of trial, despite filing a motion for discovery materials including photographs. Prior to trial, she was told that there were no photographs, but she was given photographs on the first day of trial. She testified that the prosecutor argued that he had not been obligated to furnish the photographs because the film had not been earlier developed. She testified that the belated emergence of the pictures prompted her to file an "immediate and very lengthy motion to suppress."

She testified that she was aware that the petitioner's academic performance was poor and that she explored the possibility of psychological mitigation via conversations with the petitioner, his mother, and his brother. Following these conversations, she rejected the notion of pursuing psychological evidence.

Counsel testified that she did not pursue a negotiated plea settlement because the petitioner and his mother were adamant that the petitioner was not guilty, although by the time of trial, the petitioner admitted that he had signed the confession.

She testified that she visited the scene of the crime three times and sent the investigator to investigate the scene. She went "through . . . an apartment complex looking for witnesses." She reviewed the tape submitted by Ms. Henderson. Counsel rejected the idea that the defense could have gained any advantage by her taking pictures of the crime scene. She testified that she visited the medical examiner's office to inquire about the possibility of vaginal secretions and other forensic evidence that might have been obtained from the victim's body, but she discovered none. Counsel testified that when she proposed obtaining a handwriting expert to dispute the petitioner's authorship of the confession, the petitioner admitted writing and signing the confession.

Counsel testified that "Addie Henderson wanted [her] to do a lot of things beyond what [counsel] thought was appropriate. And [counsel] tried to keep in mind that [her] client was Quncy Henderson." She testified that the strategy that the petitioner did not kill the victim was mandated by the petitioner and his mother. Ultimately, the decision to proceed to trial was the petitioner's, but counsel believed that "he was very much under the control of his mother[, who] totally believed in his innocence."

Counsel explained that she did not exploit claims that the victim was a prostitute and a drug user because she had no evidence that the victim was "trading drugs for sex that night." She

explained that the investigator's information about the victim was merely that of the victim's reputation.

Counsel testified that she believed that she "did everything [she] could do." She opined that she handled the case well.

In its order denying post-conviction relief, the lower court made the following findings:

1. The claim that counsel was ineffective in failing to pursue psychological evidence was not established; counsel inquired about the petitioner's possible learning disability and concluded that a psychological examination was not warranted.

2. No ineffective assistance of counsel was shown based upon the claim that she failed to file pretrial motions. On direct appeal, the appellate court found that counsel filed pretrial motions.

3. The petitioner failed to show that counsel neglected to obtain discovery from the state; counsel's testimony belied this claim.

4. Counsel extensively investigated the case and properly utilized the information garnered. The failure to pursue certain impeachment strategies was grounded in professional judgment.

5. The petitioner's claim that counsel did not inform him of the results of discovery and pretrial investigation was belied by the evidence of extensive meetings with the petitioner and/or his mother.

6. The petitioner's claim that counsel failed to take steps to advance an alibi defense fails because the evidence showed that the defense interviewed all available witnesses. In any event, the petitioner failed to call any neglected witnesses to testify in the evidentiary hearing and, accordingly, failed to demonstrate any prejudice from the alleged failure to present witnesses at trial. Additionally, the petitioner's mother and brother were allowed to present alibi evidence at trial.

7. The petitioner failed to establish a claim that counsel was ineffective for failing to adequately cross-examine witnesses. He failed to show how he was prejudiced by any inadequate cross-examination.

Based upon these findings, the lower court denied post-conviction relief. We hold that the record supports that court's findings and affirm the judgment.

The law is settled that the post-conviction petitioner bears the burden of establishing, at the evidentiary hearing, his allegations by clear and convincing evidence. Tenn. Code. Ann. § 40-30-210(f) (2003). Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). An appellate court is bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

When a post-conviction petitioner raises the issue of ineffective assistance of counsel, this court must determine if the evidence preponderates against the post-conviction court's findings (1) that counsel's performance was within the range of competence demanded of attorneys in criminal cases, *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975), and/or (2) that any deficient performance did not prejudice the petitioner, *Strickland v. Washington*, 466 U.S. 668, 687-89, 104 S. Ct. 2052, 2064-69 (1984). *See also Powers v. State*, 942 S.W.2d 551, 557 (Tenn. Crim. App. 1996). Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987).

We agree with the post-conviction court's conclusion that the petitioner failed to establish his claims of ineffective assistance of counsel. An overriding factor in assessing many of the lower court's findings is that the lower court accredited counsel's testimony. Although we do not revisit credibility issues, we recall that the petitioner's merit as a witness was certainly impugned by his admission that he fabricated course work to obtain an equivalency diploma. By comparison, counsel's testimony was candid, articulate, and cogent.

The claim of inadequate trial preparation, comprised of the allegations that counsel failed to discover the state's evidence, failed to interview or utilize witnesses, and failed to pursue a psychological defense, was supported by neither proof of deficient performance nor of prejudice. Counsel's testimony established that she thoroughly prepared for trial by examining the state's discovery materials, interviewing witnesses, viewing the crime scene, exploring forensic issues, and conferring with the petitioner and his mother. Additionally, with respect to the claim that witnesses were not utilized, including witnesses who might have offered psychological evidence, the petitioner failed to demonstrate prejudice; he did not present any such witnesses at the post-conviction hearing.

When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland v. Washington*.

*Black*, 794 S.W.2d at 757.

We are unpersuaded, as was the lower court, by the petitioner's claims that counsel failed to timely or adequately file pretrial motions, failed to advance an alibi defense, failed to effectively cross-examine state witnesses, and failed to exploit evidence of the victim's character. An alibi defense was presented at trial through the testimony of the petitioner's mother and brother. Not only do all of the other alleged shortcomings dwell within counsel's ambit of professional judgment, but also the petitioner established no prejudice from the claimed deficiencies.

Finally, the record supports a finding that counsel adequately conferred with and informed the petitioner. The petitioner's mother, who with his apparent consent advocated the development of his defense, admitted that she met with counsel about 100 times. Furthermore, counsel pursued and explored the evidentiary leads that developed in the case, including those provided by the petitioner and his mother.

We conclude that the record supports the post-conviction court's findings and conclusions, and accordingly, we affirm that court's denial of post-conviction relief.

_____

JAMES CURWOOD WITT, JR., JUDGE