*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JERMAINE VONSELL-DUPREE SANDERS, also known as JERMAINE VONSELL-DUPRE SANDERS,

      Defendant-Appellant.

UNPUBLISHED
December 10, 2020

No. 349107
Jackson Circuit Court
LC No. 18-004112-FH

Before: RONAYNE KRAUSE, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

A jury convicted defendant of possession with intent to deliver 50 to 449 grams of cocaine, MCL 333.7401(2)(a)(*iii*), possession with intent to deliver less than 50 grams of heroin, MCL 333.7401(2)(a)(*iv*), possession with intent to deliver methamphetamine, MCL 333.7401(2)(b)(*i*), two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, felon in possession of a firearm, MCL 750.224f, and felon in possession of ammunition, MCL 750.224f(6). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 11 to 40 years' imprisonment for each of his drug convictions, 5 to 40 years' imprisonment for each of defendant's felon-in-possession convictions, and two years' imprisonment for each of his felony-firearm convictions. Defendant appeals by right. We affirm.

## I. FACTS

On February 16, 2018, the Jackson Narcotics Enforcement Team (JNET) conducted surveillance on an apartment on South Elm Street in Jackson, Michigan. The individual under investigation was defendant. On that date, JNET asked a state trooper to conduct a traffic stop—

-1-

for a suspended license—if defendant left the apartment.[1]  As requested, the state trooper subsequently followed defendant who was driving a maroon Honda Civic.  Defendant turned off Elm Street into an alleyway behind a party store and several other businesses.  The trooper activated his siren and later his lights, but defendant initially increased his speed before stopping in a parking lot, where he was arrested and his vehicle searched.  During the search, police found suspected marijuana and a house key to the Elm Street apartment.

Police also retraced defendant's route between Elm Street and the parking lot.  In the alleyway behind the party store, police found a large sandwich bag containing multiple smaller bags of an off-white substance.  Testing on the smaller bags indicated that some of the bags contained a mixture of heroin and fentanyl and others contained cocaine.  Video footage from the party store showed that the bag found in the alleyway appeared as defendant drove through the alley followed by the state trooper.

Following the traffic stop, police obtained a warrant to search the Elm Street apartment.  In the apartment, police found two firearms and ammunition in the kitchen.  In one of the bedrooms, police found substances that later tested positive for cocaine, methamphetamine, and a combination of heroin and fentanyl.  There was one large piece of "compressed cocaine" weighing 62.28 grams, but many of the recovered drugs had been portioned into smaller amounts and placed in baggies.  For instance, in a camera bag, there were 63 small knotted bags, or knotted corners torn from plastic baggies, of suspected heroin, two of which were tested and tested positive for heroin and fentanyl.  The camera bag also contained substances that tested positive for cocaine and methamphetamine.  According to an expert in narcotics investigations, the amounts of drugs and packaging were consistent with the sale of drugs as compared to possession for personal use.

With the drugs, police also found materials related to the packaging of narcotics, such as plastic baggies, scales, and razor blades.  In contrast, police found no signs of "use paraphernalia," such as needles and pipes.  Police also found cash in the apartment: $941 in one room and $1,585 in a second room near the narcotics.  Documents bearing defendant's name were found in the apartment, including a lease, receipts, a letter, and a statement showing debit card activity.

During an interview with police, defendant incriminated himself, stating, for example, that he would buy drugs to use *and* to "flip" in order to then buy more drugs as well as pay for other items such as diapers for his daughter.  In a second interview, defendant admitted that one of the guns found in the kitchen had been given to him by a friend.  And, when informed that police found drugs in the apartment, defendant asked, "Why didn't [Ruby Canter] move it?"  Police then informed defendant that Canter did not know that defendant had been arrested, and defendant responded, "You guys got lucky."

---

[1] Defendant's driver's license was in fact suspended at the time.

At trial, the defense asserted that the drugs in the apartment did not belong to defendant. In support of this defense, Canter, the mother of defendant's child, testified that she and defendant rented the apartment together in June 2017 but that defendant moved out in November 2017.[2] According to Canter, she did not use the room where the drugs were found, and she was unaware that there were drugs in the apartment. She testified that the drugs probably belonged to two men named "Big D" and "Smoke," with whom Canter had what she described as a "fling."

The jury convicted defendant as indicated earlier, and he now appeals by right.

## II. CONFLICT OF INTEREST

Defendant first contends that he was denied his Sixth Amendment right to conflict-free counsel because his trial attorney, Suzanna Kostovski, also represented a suspected drug dealer named Anthony Oliver. Defendant, however, has failed to set forth a prima facie case of a conflict of interest, and absent an actual conflict of interest, defendant is not entitled to relief on appeal.

Correlative to the Sixth Amendment right to counsel is the "right to representation that is free from conflicts of interest." *Wood v Georgia*, 450 US 261, 271; 101 S Ct 1097; 67 L Ed 2d 220 (1981). A claim of ineffective assistance in violation of the Sixth Amendment premised on a conflict of intertest involves "a slightly different standard than that used in traditional ineffectiveness claims." *United States v Hall*, 200 F3d 962, 965 (CA 6, 2000). As explained by this Court, "[a] defendant has the burden of establishing a prima facie case of ineffective assistance of counsel. He must show that an actual conflict of interest existed and adversely affected the adequacy of his representation." *People v Lafay*, 182 Mich App 528, 530; 452 NW2d 852 (1990). A conflict of interest is "never presumed or implied." *Id*.

> An actual conflict, for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance. To find an actual conflict, we require petitioner to point to specific instances in the record to suggest an actual conflict or impairment of [his] interests and demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. A conflict may also prevent an attorney from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution. [*McElrath v Simpson*, 595 F3d 624, 631-632 (CA 6, 2010) (quotation marks and citations omitted; alteration in original).]

In contrast, an "irrelevant or merely hypothetical" conflict does not evince a violation of the Sixth Amendment right to counsel. *Hall*, 200 F3d at 966 (quotation marks and citation omitted).

---

[2] The landlord who rented the apartment to Canter and defendant testified at trial that defendant asked to be removed from the lease *after* the police searched the apartment. And, although Canter testified that defendant moved out of the apartment, defendant was found in the apartment during visits by police and Children's Protective Services *after* the police search in February 2018.

If a defendant demonstrates an actual conflict of interest adversely affecting counsel's performance, prejudice from this actual conflict is presumed. *Strickland v Washington*, 466 US 668, 692; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

> [P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above [such as those involving a complete denial of counsel]. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." [*Id*. (citations omitted).]

In this case, with regard to Oliver, the lower court record shows that during defendant's police interview, police asked defendant about his drug suppliers and, in particular, whether defendant knew someone named "AD." In the context of this conversation, defendant stated that he had grown up with AD and that he was "kind of mad" at AD because AD would not "give [him] a chance." Defendant thought that with AD's help he would have been able to "move" more.

During trial, attorney Kostovski informed the trial court that AD, whose real name is Anthony Oliver, had been federally indicted on drug charges and that she was representing Oliver in federal court. On the basis of her representation of both defendant and Oliver, Kostovski suggested that she had a conflict because, although she did not interpret defendant's comments during his interview as implicating Oliver in criminal activity, defendant's remarks could be interpreted in this manner. Kostovski specifically viewed her dilemma as whether she could inform Oliver of what she heard in the video of defendant's interview. In response, the trial court indicated that a video played in court was not confidential, and Kostovski agreed with this assertion. Nevertheless, Kostovski stated that she thought it was "probably in everyone's best interest that [she] be relieved at this point from representing [defendant] because of . . . the dueling loyalties that are going on that [she had]."[3] Following Kostovski's remarks, the trial court

---

[3] On appeal, defendant also argues that Kostovski provided ineffective assistance by failing to withdraw in light of her conflict. Kostovski, however, clearly alerted the trial court to the potential conflict and asserted that it would be best if she withdrew, but the trial court *denied* the request. Having in fact raised the issue, defense counsel is not ineffective merely because her argument did not prevail. See *People v Petri*, 279 Mich App 407, 412-413; 760 NW2d 882 (2008) ("A failed strategy does not constitute deficient performance."). And, in any event, as will be discussed, the record does not support defendant's claim of an actual conflict of interest that would have necessitated counsel's withdrawal from the case. See *Lafay*, 182 Mich App at 530. Absent an

concluded that it would not let Kostovski withdraw from representing defendant. The trial court rejected the idea of a "major problem" arising from Kostovski's representation of both clients, emphasizing that the evidence in question was "just a few seconds of testimony" and that it was the trial court's ruling, not any action by Kostovski, that caused the evidence to be brought out in defendant's trial.

On appeal, defendant now contends that Kostovski's representation of Oliver created an impermissible conflict of interest that denied him the effective assistance of counsel. Specifically, defendant makes two arguments. First, he asserts that, as a result of her representation of Oliver, Kostovski refrained from presenting evidence to support Canter's testimony that the drugs found in the Elm Street apartment belonged to Big D and Smoke because such evidence would have revealed Oliver as their supplier. Second, defendant contends that Kostovski failed to obtain a plea bargain for defendant because a deal for defendant may have required him to incriminate Oliver. Defendant's arguments lack merit.

To begin with, there is absolutely no evidence that Oliver had anything whatsoever to do with the drugs that resulted in the charges against defendant or that Oliver's criminal charges were in any way connected to the drugs in the Elm Street apartment or to Smoke and Big D. Defendant speculates that Oliver may have supplied the drugs in question to Smoke and Big D, and he posits that Kostovski could have presented such evidence or cross-examined witnesses about this possibility. But defendant's theory that Oliver supplied the drugs in his apartment to Smoke and Big D simply has no basis in the record. Absent evidence to support his assertion, the conflict between his interests and Oliver's is merely hypothetical, and it is not indicative of an actual conflict. See *Hall*, 200 F3d at 966. Likewise, this unsubstantiated conflict does not demonstrate that Kostovski made a choice not to elicit evidence helpful to defendant in order to protect Oliver; indeed, there is no indication such evidence exists.[4] See *McElrath*, 595 F3d at 631-632.

Moreover, the fact that Oliver's seemingly unrelated drug charges were to be tried in separate proceedings strongly supports the conclusion that Kostovski did not face a conflict of interest from her representation of both clients. Cf. *Cuyler v Sullivan*, 446 US 335, 347; 100 S Ct 1708; 64 L Ed 2d 333 (1980) ("[T]he provision of separate trials for Sullivan and his codefendants significantly reduced the potential for a divergence in their interests."). Indeed, given that the trials were separate, there was no reason for Kostovski to have had any particular concern about the

---

actual conflict, defense counsel's representation of defendant and Oliver in their separate cases did not constitute ineffective assistance in violation of the Sixth Amendment. See *id.*

[4] In addition to his conflict-of-interest claim involving Oliver, in a more traditional ineffective assistance claim, defendant also asserts that counsel failed to investigate and to present evidence to corroborate Canter's testimony regarding Smoke and Big D. But the record simply does not support defendant's assertions that counsel failed to investigate or that there was corroborating evidence available that defense counsel failed to present. Absent support for the factual predicate of his claim, defendant's ineffective assistance claim fails. See *People v Putman*, 309 Mich App 240, 248-249; 870 NW2d 593 (2015).

possible impact of her tactics in defendant's trial on the outcome of Oliver's case or vice versa.[5] See *Burger v Kemp*, 483 US 776, 786; 107 S Ct 3114; 97 L Ed 2d 638 (1987). In short, defendant has failed to point to any specific instances in the record to show that, when representing defendant and developing her trial strategy, Kostovski had an actual conflict that adversely affected her performance. See *Strickland*, 466 US at 692; *Lafay*, 182 Mich App at 530.

Alternatively, defendant contends that Kostovski failed to obtain, or as least explore the possibility of, a plea bargain for him because doing so may have involved defendant's offering evidence against Oliver. There is, however, no evidence in the record to support this assertion. For example, there is no indication that defendant wanted a plea bargain, that he had information about Oliver that would have warranted a plea,[6] that Kostovski was aware that defendant possessed valuable information about Oliver, that Kostovski failed to explore the possibility of a plea bargain in defendant's case, or that, more specifically, Kostovski failed to negotiate for a plea in order to protect Oliver. Equally important, there is no indication that the Jackson County Prosecutor had any interest in bargaining with defendant in exchange for evidence against Oliver. Cf. *Burger*, 483 US at 785 (rejecting conflict-of-interest argument in the context of a plea when prosecutor was uninterested in bargaining). Indeed, there is very little information in the record about the possibility of a plea. At most, before trial, the prosecutor indicated that there were "no offers on this file" and that the case would likely proceed to trial. Later, on the first day trial, defense counsel noted that the case did not settle "because the People's offer was a non offer versus going to trial, same results as far as the potential for punishment." If anything can be drawn from these brief comments, the record suggests that the prosecutor was *not* interested in giving defendant a "deal." Regardless, defendant's assertions about the potential for a plea, the efforts or lack thereof made by Kostovski, defendant's information about Oliver, and the prosecutor's willingness to enter into a plea have no basis in the record. Absent evidence to support his contentions that Kostovski failed to explore the possibility of a plea and that the prosecutor would have made a deal with defendant, defendant's claim that counsel's performance was adversely affected by a conflict of interest lacks merit.[7] See *McElrath*, 595 F3d at 631-632; *Lafay*, 182 Mich App at 530.

---

[5] The only concern that Kostovski identified in connection with her representation of both defendant and Oliver was whether she could disclose the contents of defendant's interview to Oliver. The trial court reasonably rejected this concern, correctly recognizing that materials played in court were matters of public record and not privileged materials. See *Reed Dairy Farm v Consumers Power* Co, 227 Mich App 614, 620; 576 NW2d 709 (1998) (concluding materials in lower court file were "public documents" and not privileged materials).

[6] During his interview, defendant alluded to Oliver's moving drugs, but his knowledge of Oliver's activities is at best unclear. Indeed, defendant expressed some anger because Oliver would not allow him to become involved. Given the vagueness of defendant's statements about Oliver during the police interview and defendant's lack of involvement in Oliver's operations, it is not clear what information defendant now believes he could have offered about Oliver.

[7] In attempting to provide evidence to support his argument, defendant points to his police interview, and he asserts that authorities were willing to bargain with him for information about Oliver as demonstrated by police questions during their interrogation of defendant. The fact,

Because defendant failed to establish a prima facie case of an actual conflict of interest, defendant's ineffective assistance claim premised on a conflict of interest cannot be sustained and defendant is not entitled to relief on appeal. See *Strickland*, 466 US at 692; *Lafay*, 182 Mich App at 530.

### III.  PROSECUTORIAL MISCONDUCT

Next, defendant argues that the prosecutor made impermissible arguments—relating to Oliver, other-acts evidence, defendant's admissions during his police interviews, vouching, and civic duty or sympathy—that denied defendant a fair trial. Additionally, defendants contends that the cumulative effect of these errors warrants a new trial. Although we agree that the prosecutor advanced an impermissible civic-duty argument, we conclude that this brief improper argument does not entitle defendant to relief on appeal. Defendant's other claims of error lack merit.

The majority of defendant's prosecutorial-misconduct arguments are unpreserved and thus reviewed for plain error as defendant failed to contemporaneously object and request a curative instruction. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). In comparison, defendant objected to the prosecutor's appeal to the jurors' emotions when the prosecutor stated that drugs kill people, and defense counsel interjected—saying "[h]old it, hold it"—when the prosecutor mentioned AD. Both these issues, however, were resolved in defendant's favor, and defendant made no request for additional relief, such as a curative instruction or mistrial. By failing to request additional relief after obtaining a favorable ruling, defendant failed to preserve his assertion that additional relief was warranted. See *People v Milstead*, 250 Mich App 391, 402; 648 NW2d 648 (2002); *People v Nash*, 244 Mich App 93, 96-97; 625 NW2d 87 (2000); see also *People v Wise*, 134 Mich App 82, 105; 351 NW2d 255 (1984).

"Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) (citations omitted). "A prosecutor has committed misconduct if the prosecutor abandoned

---

however, that police asked defendant about "AD" does not, without more, evince a willingness to engage in plea bargaining. See *People v Hicks*, 185 Mich App 107, 114; 460 NW2d 569 (1990) (concluding that conversation did not involve "plea negotiations" when "the possibility of a guilty plea was never discussed nor was one offered or accepted"). Further, plea bargaining is a matter within the *prosecutor's* discretion, and the police generally lack authority to bind the prosecutor. See *People v Killebrew*, 416 Mich 189, 199 n 1; 330 NW2d 834 (1982); *People v Gallego*, 143 Mich App 639, 641; 372 NW2d 640 (1985), aff'd 430 Mich 443 (1988). There is no indication that police acted on behalf or at the direction of the prosecutor's office during defendant's interrogation. See *People v Smart*, 304 Mich App 244, 252; 850 NW2d 579 (2014). Accordingly, even assuming police wanted information about Oliver, the fact remains that nothing in the record shows any willingness by the prosecutor to enter into a plea bargain with defendant in exchange for information about Oliver. Absent evidence that the prosecutor was willing to plea bargain with defendant in exchange for information about Oliver, defendant's assertion that Kostovski's performance during plea negotiations was adversely affected by a conflict of interest fails. See *Burger*, 483 US at 785.

-7-

his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial." *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014). For example, a prosecutor may not make a statement of fact to the jury that is not supported by the evidence. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). And a prosecutor may not vouch for witnesses by suggesting "some special knowledge that the witnesses were testifying truthfully." *Id*. A prosecutor also may not appeal to the jurors' sympathies or urge them to convict on the basis of their civic duty. *Unger*, 278 Mich App at 237.

"When reviewing a claim of prosecutorial misconduct, this Court must examine the pertinent portion of the record and evaluate a prosecutor's remarks in context." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). "[A] prosecutor's comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *Id*. The propriety of the prosecutor's remarks will depend on *all* the facts of the particular case in question. *People v Bahoda*, 448 Mich 261, 267 n 7; 531 NW2d 659 (1995).

## A. ARGUMENT INVOLVING OLIVER

Defendant raises several claim of prosecutorial misconduct. First, defendant contends that the prosecutor advanced an improper argument that defendant had a propensity to commit crimes as evinced by the association between defendant and Oliver. In making this argument, defendant also asserts that the trial court forbade mention of Oliver at trial.

Contrary to defendant's argument, the trial court did not forbid mention of Oliver, or AD, at trial. To the contrary, the trial court ruled that video of defendant's police interview, including the portion in which defendant mentioned AD, would be *admitted* at trial. When mentioning AD during rebuttal, the prosecutor discussed defendant's statements about AD during the police interview. This was not improper.[8] In highlighting defendant's statements about AD, the prosecutor did not advance a guilt-by-association theory. Indeed, it was frankly irrelevant whether AD was actually a drug dealer at all. What was relevant—and why the trial court admitted defendant's statements about AD and why the prosecutor sought to emphasize the statements— was that *defendant* appeared to believe that AD was dealing drugs and that he was upset that AD would not allow him to become involved because defendant thought that he could "move" more product with AD's help. Defendant's statements about AD went directly to his intent to deliver drugs, which was an element of each of the drug charges. See *People v McGhee*, 268 Mich App

---

[8] Defendant notes that the trial court and defense counsel interjected during the prosecutor's discussion of AD and that after a bench conference the prosecutor moved on with his rebuttal without further mention of AD. According to defendant, this showed that the prosecutor's argument was improper. We disagree. Neither the trial court nor defense counsel placed a reason for the interruption on the record. And, in our view, when the record is considered as a whole, it appears that the interjection was related to the discussion of defendant's comments about AD in *open court*. That is, although the trial court admitted defendant's statements about AD, at defendant's request the trial court ruled that the courtroom would be closed while defendant's interview was played for the jury. Given this background, it appears that the prosecutor was interrupted during his rebuttal to prevent discussion of defendant's comments about AD in open court.

600, 610; 709 NW2d 595 (2005). And the prosecutor did not engage in misconduct by arguing the relevant evidence and all reasonable inferences arising from that evidence as it related to his theory of the case. See *Unger*, 278 Mich App at 236.

### B. ARGUMENT INVOLVING OTHER-ACTS EVIDENCE

Next, defendant argues that the prosecutor improperly used evidence of a prior drug transaction as substantive evidence of his guilt. According to defendant, the other-acts evidence could only be used under MRE 404(b) for purposes of establishing a common plan, scheme, or system and the prosecutor engaged in misconduct by using the evidence during rebuttal in an attempt to establish knowledge and intent. Contrary to defendant's argument, both knowledge and intent are proper purposes enumerated in MRE 404(b). And, in this case in particular, the trial court admitted the other-acts evidence in question, instructing the jury on its use for purposes of knowledge, intent, and common plan, system, or scheme.[9] In short, the prosecutor did not engage in misconduct by arguing "that the MRE 404(b) evidence was relevant to defendant's knowledge, intent, and scheme, all clearly proper purposes under MRE 404(b)." *McGhee*, 268 Mich App at 635.

### C. DEFENDANT'S ADMISSIONS

Defendant also argues that the prosecutor misled the jury by stating that defendant confessed to drug trafficking during his police interviews. Specifically, defendant challenges the following remarks from the prosecutor's rebuttal argument: "So what does he admit? He admits, yeah, I do this, I'm a drug dealer." Defendant is correct that he did not specifically say the words "I am a drug dealer" during his interviews with police. But as the prosecutor detailed at trial, defendant made several incriminating statements that can reasonably be construed as admissions of selling drugs. Thus, the prosecutor did not engage in misconduct by arguing from the evidence that defendant admitted to being a drug dealer. See *Unger*, 278 Mich App at 236.

More fully in context, the prosecutor's argument regarding defendant's admissions was as follows:

> He told them he doesn't know anything doesn't know anything about drugs. But then he says, well, I know how to hustle. He flips. What did he say? You heard the interview and I'd ask you to listen to it again.

---

[9] Although defendant raised the MRE 404(b) issue on appeal as a question of improper argument by the prosecutor, in his reply brief defendant changes course and argues for the first time that the trial court erred by admitting the evidence. We need not consider this issue, which was improperly presented in defendant's reply brief. See *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003); MCR 7.212(G). Moreover, defendant's evidentiary argument in his reply brief is conclusory, made without citation to any supporting authority and without any analysis regarding the admission of the other-acts evidence. By failing to adequately brief the issue, defendant has abandoned his evidentiary claim. *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016).

Go back and he says, yeah, I get a T-shirt. It's enough for me to use and I flip some so I can buy another T-shirt. And then I buy my daughter some diapers. So he buys dope, he uses dope, he sells dope so he can turn around and buy more dope and diapers.

So when he says he doesn't know anything about drugs, he admits actually he sells drugs. So what does he say? He says, oh AD, yeah we grew up together. But I'm actually kind of mad at him because he won't—

\* \* \*

What does he say? He says I know this guy, we grew up together.

\* \* \*

So what does he admit? He admits, yeah, I do this, I'm a drug dealer. Then he says to the detectives once they say, well, hey, you remember when we were in the house and we found all this stuff and what's his response? Well, why wouldn't she hide the drugs. And they have to tell him, because she didn't know that you were in jail. So we got there and all of your drugs were still sitting out on the table.

In the police interviews, defendant indicated that he would "flip" drugs to purchase items, that he believed that he could have moved "more" with AD's assistance, that he knew how to "hustle," and that the police "got lucky" that Canter failed to move the large quantity of drugs in the apartment before the search. Overall, considering the prosecutor's comments as a whole and in light of defendant's statements during his police interviews, the prosecutor did not engage in misconduct by arguing that defendant's statements, especially when taken together, were effectively an admission that he was a "drug dealer." Defendant has not shown error.

## D. VOUCHING

Defendant asserts that the prosecutor improperly vouched for law enforcement witnesses (1) during closing argument and (2) again during rebuttal.

Considering the prosecutor's remarks during closing argument in context and in light of all the evidence produced at trial, the prosecutor's brief comments on the officers' experience and expertise and the reminder that the officers offered their testimony about their investigation under oath were not improper because these remarks did not suggest any special knowledge of the officers' truthfulness. See *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). Further, these assertions were based on the record insofar as there was evidence about the officers' respective experience and one officer's particular expertise in narcotics investigations. And of course, the officers did in fact testify under oath at trial. "The prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility." *People v Bennett*, 290 Mich App 465, 478; 802 NW2d 627 (2010). The prosecutor's rather innocuous remarks about law enforcement did not constitute improper vouching. See *id*. at 478-479.

In addition to his challenge of the prosecutor's remarks about the police during closing argument, defendant also asserts that the prosecutor vouched for the police during rebuttal by making the following remark:

> Ladies and gentlemen, there are a few things that get me really fired up. I try to stay pretty calm, but what I don't like is when we want to get into a credibility contest with people that put their careers on the line and you know it when you come up here and they support it with evidence time and time and time again.

Following this remark, the prosecutor stated, "So let's talk about credibility." And the prosecutor then discussed credibility issues relating to defendant, Canter, the landlord, and others.

Defendant now claims that the prosecutor's remark about being "fired up" about the credibility contest amounted to improper vouching. When taken as a whole, however, the prosecutor asserted that the police were worthy of belief because they "put their careers on the line" and they supported their testimony "with evidence." Cf. *Thomas*, 260 Mich App at 455 (finding no error when "[t]he prosecutor argued that lying on the stand would cost the officer his career"). The rebuttal argument regarding the officers' credibility was not improper, particularly in response to defense counsel's attacks on the officers' credibility during her closing argument. See *Bennett*, 290 Mich App at 478-479; *Thomas*, 260 Mich App at 455.

### E. CIVIC DUTY, SYMPATHY, AND EMOTIONS

Next, defendant argues that the prosecutor impermissibly appealed to the jurors' sense of civic duty, sought sympathy, and played to the jurors' emotions by stating during closing argument that drugs kill people, like the nephew of an excused prospective juror who died of a heroin overdose. There was a quick objection by defense counsel, which was sustained by the trial court.

The prosecutor improperly injected issues broader than defendant's guilt or innocence by appealing to the jurors' sense of civic duty, seeking sympathy from them, and playing on the jurors' emotions. See *Bahoda*, 448 Mich at 284-285; *People v Williams*, 65 Mich App 753, 756; 238 NW2d 186 (1975). The error or misconduct, however, does not warrant reversal of defendant's convictions. The prosecutor's improper remarks were brief and isolated. *Unger*, 278 Mich App at 239. Additionally, although no immediate curative instruction was requested, the jurors were ultimately instructed to render a verdict solely on the basis of "the evidence that has been properly admitted in this case." They were specifically instructed to "not let sympathy or prejudice influence [their] decision." And they were told that "[t]he lawyers' statements and arguments and any commentary are not evidence." "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id*. at 235 (citations omitted).

Additionally, given the strong evidence of defendant's guilt—including his own admissions, the drugs thrown from his vehicle while police were following him, as shown in video footage, the large quantity of drugs found in the apartment, and the proofs of residency linking defendant to the apartment—he is not entitled to relief on appeal because the prosecutor's brief improper remarks did not affect the outcome of the proceedings. See *id*. at 239; see also *People v*

*Mezy*, 453 Mich 269, 285-286; 551 NW2d 389 (1996) (concluding that the prosecutor's improper comments having "only slight or negligible influence on the verdict" were harmless).

## F. CUMULATIVE ERROR

Lastly, in the context of his prosecutorial-misconduct argument, defendant contends that even if the prosecutor's remarks do not warrant reversal individually, the cumulative effect of these errors denied him a fair trial.[10] "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*.

In this case, the majority of defendant's prosecutorial-misconduct arguments lacks merit. It is true that the prosecutor impermissibly raised a civic-duty argument or an argument appealing to the jurors' emotions and sympathies. But for the reasons discussed, the brief improper remarks did not undermine confidence in the verdicts in light of the jury instructions and the strong evidence of defendant's guilt. See *id*. We conclude that defendant is not entitled to relief on appeal.

## IV. FAIR CROSS SECTION

Defendant maintains on appeal that he was denied his right to a jury drawn from a fair cross section of the community. According to defendant, African-Americans were underrepresented on his venire and have been systematically excluded from venires in Jackson County. Defendant failed to challenge the composition of the jury array in the trial court, meaning that his claim is

---

[10] Alternatively, defendant asserts on appeal that counsel provided ineffective assistance by failing to object to the alleged instances of prosecutorial misconduct. But the majority of the arguments by the prosecutor—regarding AD, the other-acts evidence, defendant's admissions, and comments on witness credibility—constituted permissible argument, and defense counsel did not provide ineffective assistance by failing to raise meritless objections to these arguments. See *Putman*, 309 Mich App at 245. In comparison, the prosecutor exceeded the bounds of permissible argument by injecting the death of an excused juror's nephew, thereby raising a civic-duty argument involving issues broader than defendant's guilt or innocence. The record, however, also shows that defense counsel quickly and successfully objected to this line of argument, bringing a quick halt to the prosecutor's remarks. And as discussed, the brief improper comments did not affect the outcome of the trial given the jury instructions and the strong evidence of defendant's guilt. On this record, defendant has not shown that counsel's performance fell below an objective level of reasonableness or that, but for counsel's performance, there was a reasonable probability of a different outcome. See *People v Jackson*, 292 Mich App 583, 600-601; 808 NW2d 541 (2011).

unpreserved and reviewed for plain error.[11]  See *People v Jackson (On Reconsideration)*, 313 Mich App 409, 428; 884 NW2d 297 (2015).  We find no plain error.

"The Sixth Amendment of the United States Constitution guarantees a defendant the right to be tried by an impartial jury drawn from a fair cross section of the community."  *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012).  But a defendant is "not entitled to a jury of any particular composition," and there is no requirement "that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."  *Taylor v Louisiana*, 419 US 522, 538; 95 S Ct 692; 42 L Ed 2d 690 (1975).  Rather, the fair-cross-section requirement provides that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."  *Id*.

A defendant claiming a violation of the Sixth Amendment's fair-cross-section requirement must set forth a prima facie case showing:

> (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.  [*Bryant*, 491 Mich at 597 (quotation marks and citation omitted).]

Under the second prong, when applying relevant statistical tests to analyze the representation of a distinct group, "a court must examine the composition of jury pools and venires *over time* using the most reliable data available to determine whether representation is fair and reasonable."  *Id*. at 599-600.  In other words, under the second prong, a determination of underrepresentation is *not* determined by analyzing a defendant's "individual venire."  *Id*. at 600.  For purposes of the third prong, "[a] systematic exclusion is one that is inherent in the particular jury-selection process utilized."  *Id*. at 615-616 (quotation marks and citation omitted).

In this case, African-Americans constitute a distinct group in the community for purposes of the fair-cross-section requirement; therefore, defendant has satisfied the first prong of a prima facie case.  *Id*. at 598.  But defendant has fallen far short of establishing the systematic exclusion of African-Americans from the jury-selection process under prongs two and three.

First, both defendant and the prosecutor focus on the composition of defendant's specific jury array rather than the composition of jury pools and venires over time as required under *Bryant*.

---

[11] Defense counsel raised a challenge under *Batson v Kentucky*, 476 US 79, 89; 106 S Ct 1712; 90 L Ed 2d 69 (1986), and in the course of this *Batson* discussion, there were allusions to a fair cross section and assertions of defendant's right to "a jury representative of his race."  Defense counsel's argument in the trial court, however, was very clearly a *Batson* challenge to the prosecutor's exercise of a peremptory challenge to excuse an African-American from the jury.  An objection on one ground as to an issue will not preserve an argument on appeal in regard to a different ground.  *People v Hershey*, 303 Mich App 330, 347; 844 NW2d 127 (2013).

See *id*. at 599-600.  Defendant, for example, contends that to be representative of a fair cross section of the community, his venire, which he asserts had 50 people, should have contained four African-Americans but that there was only one African-American in the array.  Factually, defendant's representations cannot be reconciled with the record.  There was *one* African-American prospective juror who made it into the jury box for voir dire but who was struck by the prosecutor.  But according to defense counsel's remarks at trial, there were *three* other African-American prospective jurors.  In other words, it appears that defendant's array contained four African-Americans, which is the minimum number of African-Americans that defendant himself contends should have been in the venire in order to represent a fair cross section of the community.

Moreover, defendant's focus solely on his own array is misplaced because whether representation of a distinct group is fair and reasonable requires evaluating venire compositions over time.  Apart from discussion of his own array, defendant merely offers the unsubstantiated assertion that underrepresentation of African-Americans on jury venires has been "complained about" in other cases from Jackson County.[12]  Defendant quotes the trial court as remarking that there are not "that many" African-Americans in the jury pools in Jackson County, making it "nearly impossible" to obtain a representative sample on a jury.  But defendant provides no actual data regarding jury venires over time, and he makes absolutely no attempt to engage in any kind of statistical analysis to demonstrate that the representation of African-Americans on jury venires over time was not fair and reasonable.  See *People v Williams*, 241 Mich App 519, 526; 616 NW2d 710 (2000).  Likewise, with regard to the third prong, defendant offers no evidence of the jury-selection process in Jackson County, and he certainly presents no evidence of anything inherent in that process that results in the "systematic" exclusion of African-Americans from Jackson County jury pools.  Accordingly, defendant has failed to set forth a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, and he is thus not entitled to relief on appeal.[13]

## V.  REQUEST FOR A REMAND

Appearing to recognize the lack of evidentiary support for his various claims regarding conflict of interest, ineffective assistance, and systematic exclusion from the jury array, defendant requests a remand for further factual development, including an evidentiary hearing, discovery of data relating to Jackson County jury venires over time, and the appointment of an expert to conduct statistical analyses.  A request for a remand, however, requires an affidavit or offer of proof

---

[12] Defendant cites two unpublished decisions from this Court originating in Jackson County in which the defendants raised systematic exclusion challenges.  In both cases, the challenges failed on appeal because the defendants did not present any evidence of systematic exclusion.  Defendant does not explain how these cases, which like here lacked evidentiary support, aid his position.

[13] Alternatively, defendant asserts that defense counsel provided ineffective assistance by failing to raise a fair-cross-section objection in the trial court and to retain an expert to develop a factual record to support this claim.  But absent a factual basis for an objection or to establish that consulting with an expert on jury-venire statistics would have affected the outcome, defendant cannot show that counsel provided ineffective assistance by failing to raise the jury composition issue in the trial court.  See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

regarding the facts to be established.  MCR 7.211(C)(1)(a).  Defendant has made no such offer, and this Court previously denied defendant's request for a remand without prejudice.[14]  Lacking a supporting affidavit or offer of proof demonstrating the facts he believes will be established on remand, we again deny defendant's request for a remand.  See *People v Chapo*, 283 Mich App 360, 369; 770 NW2d 68 (2009); *Williams*, 241 Mich App at 527 n 4.

We affirm.


/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Stephen L. Borrello

---

[14] See *People v Sanders*, unpublished order of the Court of Appeals, entered January 17, 2020 (Docket No. 349107).